## NEW YORK OYER AND TERMINER.

MARCH, 1851

Before EDMONDS, Justice, and two aldermen.

---

### THE PEOPLE v. THOMAS PRITCHARD.

The difference between murder and manslaughter.
And the difference between the first, second, and third degrees of manslaughter.

THE prisoner was indicted for murder. He was a young man, about seventeen years old, and was born in Ireland. His father had been a drinking man, and had died of cholera. The prisoner worked occasionally as a carpenter, but had no steady occupation. He was the leader of a gang of young men, on the east side of the town, known as very disorderly and turbulent. Some of them were known to the police as Fighting Tom, Butcher Bill, Four-fingered Dutch, and Johnny. Three of them kept their mistresses, who were present at the trial.

Early one morning, between five and six o'clock, all four of these young men entered a grocery store in that part of the town, headed by the prisoner, who was the youngest and smallest of the gang. On entering, the prisoner went directly to the counter, behind which the deceased was standing, waiting on customers, and said to him : " I had a muss with you about a week ago. What ought I to do with you ?" The deceased answered " I don't know. You carried on pretty bad and deserved it." Upon that the prisoner caught up a pound lead weight from the counter, and hurled it at the deceased. It struck him on the head and he fell. One of the gang said, " come ! let's go," but the prisoner said, " don't be in a hurry," and after remaining a few minutes they all left the store.

After a little while the deceased arose from his fall, and waited upon one or two customers, holding his hand to his

head, and complaining that he was badly hurt. He soon left the store and retired to his bedroom, where he soon became unconscious, and in about an hour died.

A post mortem examination showed that the skull had been fractured, the blood-vessels of the brain ruptured, and congestion and death ensued.

It appeared in evidence that about a week before this, the prisoner, with his companions, had entered the same store, in a state of intoxication, and called for some liquor, which the deceased refused to give them. Thereupon the prisoner had become violent and abusive, and had been turned out of the store, and after he got out of doors he had continued his disturbance until the police had taken him away. While being taken away he uttered repeated threats of having satisfaction.

On the night of the murder, and immediately preceding it, the prisoner and his companions had spent the time in visiting various drinking-houses, in some of which they got into quarrels by refusing to pay for their liquor, and in visiting one or the other of their mistresses, and playing cards, and about day-light had sallied out in a state of intoxication.

After the affray the prisoner had concealed himself, but was betrayed by one of the girls, and was found in one corner of a bedroom, about midnight, buried under a pile of old clothes and carpets.

The question presented to the jury was whether the offense was murder or manslaughter, and the judge charged them that that depended entirely on the question whether there had been an intention to kill, for if there had been, it was murder, otherwise manslaughter.

And he told them that in determining that question, the jury must consider the prisoner's quarrelsome disposition, his previous threats, his entering upon a quarrel as soon as he got into the store, his taking his associates with him, as if to protect himself from arrest or interruption, his refusal to leave the store when urged, even after the blow, and his subsequent concealment. And on the other hand, they must not overlook the fact that the weapon used was not carried with him, but

found in the store, so that he had not gone there armed or prepared to take life, and that all the other circumstances were just as consistent with an intention to do violence alone, as with an intention to kill.

If the jury believed that there was an intention to kill, although that intention was formed at the very instant the weight was thrown, it was murder.

But if they did not believe that there was at any time such an intention, it was manslaughter.

Not manslaughter in the first degree, for that included only homicides where the offender was engaged in the perpetration of some other crime, or assisting a person to commit suicide or willfully killing of an unborn quick-child, but manslaughter in the second degree, which is the killing in the heat of passion, but in a cruel and unusual manner, or in the third degree, which is killing in the heat of passion, by a dangerous weapon.

Inasmuch as there was no question in the case that the homicide had been perpetrated, and by the prisoner, the verdict must be guilty of either murder, or manslaugher in the second or third degree.

The jury, after being out all night, came into court the ensuing morning. The prisoner was placed at the bar.

The clerk of the court, having called over the names of the jury, asked them if they had agreed.

The foreman answered "yes."

The clerk then said: "Jurors, look upon the prisoner; prisoner, look upon the jurors. Gentlemen, how say you? Is Thomas Pritchard guilty of the murder, or not."

Foreman —"Guilty of manslaughter in the first degree."

*The Judge:* I do not know what to do with such a verdict, gentlemen. I do not see how it can possibly be manslaughter in the first degree. There is no section of manslaughter in the first degree that could include this case.

*H. L. Clinton,* on behalf of the prisoner, said that his

associate counsel, Mr. H. F. Clark, had contended that the jury might find the prisoner guilty of any of the four degrees of manslaughter, if they believed him guilty at all; and he, Mr. Clinton, thought that though manslaughter in the second degree would have answered the circumstances of the case, yet he was of opinion that the verdict rendered could be received by the court.

*The District Attorney* said that their honors were aware that he had the misfortune to differ from the presiding judge with regard to the construction of that section of the statute.

*The Judge:* I instructed the jury that they should find a verdict of guilty of murder, or manslaughter in the second or third degree. They might as well have found the prisoner guilty of horse stealing as manslaughter in the first degree. They were bound to take the law from the court, and they — the jury — were to decide upon the facts. The jury have compromised their verdict; they have gone into matter that has not been submitted to them.

*The District Attorney, and Mr. Clinton,* considered that the jury had a right to render the verdict as they had given it.

*The Judge* then said: The counsel for the prosecution, and for the prisoner, having agreed to take the verdict, I will not allow my own impressions on the subject to interfere, but I am fully convinced that it is against the law of the land. The clerk will, however, record the verdict.

The verdict was then recorded, that Thomas Pritchard was not guilty of murder, but was guilty of manslaughter in the first degree.

The prisoner was sentenced to the State prison for life.

[NOTE.—I add to the foregoing the following facts, as calculated to show the state of society in which they occurred:

## The People v. Pritchard.

The prisoner was brought up for sentence, with four others, one or two of whom were sentenced to be hung, and the others to the State prison. The occasion was a very solemn and impressive one, and studiously made so, because of the dense crowd in the court room. When Pritchard was to be sentenced, and he was the last one of the five, one of the aldermen said to the presiding judge, "Give this boy a good talking to; the room is full of his associates and companions, and it will do good." The judge replied, "You are mistaken; they have not come here to profit by the lesson of his fate, but to see him 'die game,' as they call it. Did you not observe that during the whole of his trial our galleries were filled with his 'pals' and associates, and that even their girls were among them? The same set are here now, and for the same purpose, and our words would be wasted on them."

So, when he was arraigned for sentence, all that the judge said was, "Thomas Pritchard, you are sentenced to the State prison for life. Officers, remove your prisoners."

They were removed, and the crowd rushed from the court room. One of the officers afterward reported that they were accompanied, on their passage from the court room to the prison, by a hundred or two of the same class of society, who gathered close around, and frequently spoke to him; and one of them had said, "Tom! Tom! what a G——d d——n hog that judge was! He talked to all them other fellows, but he didn't say a word to you. He hung you up just as he would a d——n dog!"

After the trial was over the judge received the following note, as he was given to understand, from one of the jurors:

"We have been informed that in the case of the boy Pritchard, the jury were in favor of bringing in a verdict of murder against the prisoner, almost from the moment of their entering into the jury room, until within a few minutes of their entering into the court room. They were all desirous of producing the effect of their verdict, so far it decided the fate of the prisoner, but the majority were desirous of bringing in a verdict of murder, as an act of duty toward the public.

"Some of the jurors were fearful that if the verdict of murder had been given, with a recommendation to executive clemency, in consequence of his youth, as was their intention, that in such case his sentence would have been remitted to that of twenty-one years imprisonment, whereas, by giving a verdict of manslaughter in the first degree, they were sure that his sentence would be such as has been justly meted out to him—'Imprisonment and hard labor for life in the State prison.'"]