Clifford vs. The State.

———————————

## CLIFFORD vs. THE STATE.

*October 6 — November 20, 1883.*

CRIMINAL LAW AND PRACTICE: MURDER. *(1) Separation of jurors before panel complete. (2, 4) Murder in first degree: provocation: premeditation. (3, 5, 6) Self-defense: instructions to jury. (7) Presumptions from use of dangerous weapon.*

1. The fact that the jurors accepted by the parties in a trial for murder were allowed to separate before the panel was filled will not work a reversal of the judgment unless it appears that in consequence of such separation the jurors were improperly influenced and that knowledge of such improper influence did not come to the defendant before the trial.

2. A premeditated killing, if not justifiable, is murder in the first degree, without regard to the provocation or surrounding circumstances.

Clifford vs. The State.

3. Where the statutory definition of self-defense (R. S., sec. 4366, subd. 2) was given several times in the charge of the court, a refusal to give an instruction "that if the defendant acted from reasonable and honest convictions at the time of the killing, he could not be held responsible criminally for a mistake in the extent of the actual danger," would not work a reversal of the judgment.

4. To constitute murder in the first degree, the wilful intent, premeditation or deliberation need not exist for any particular length of time before the crime is committed. It is sufficient if there was a design and determination to kill distinctly formed in the defendant's mind before he committed the act resulting in death.

5. Mere restraint of personal liberty, or imprisonment without warrant, will not support the plea that a homicide was committed in self-defense.

6. If A. points a loaded pistol at B. and B. grapples with him to prevent the shooting, A. cannot then shoot B. and allege that he did so in self-defense.

7. Instructions on a trial for murder that "a reasonable man intends all the natural, probable, and usual consequences of his act;" that "if a reasonable man uses a deadly weapon and life is taken, he is presumed to intend the natural consequences of his act and would be guilty of murder;" and that "when one person assaults another violently with a dangerous weapon likely to kill, not in self-defense and not in a sudden heat of passion caused by provocation apparently sufficient to make passion irresistible or involuntary, and the life of the party thus assaulted is actually taken in consequence of such assault, the legal and natural presumption is that death or *great bodily harm* was intended, and in such case the law implies malice and such killing would be murder," are held to have been proper as against the defendant. The words "or great bodily harm" in the last instruction were too favorable to him, and should have been omitted.

ERROR to the Circuit Court for *Rock* County.

The information in this case was filed in the circuit court for Racine county, and charged that on the 14th day of April, 1882, at said county, the defendant, *Hartley Clifford*, did "wilfully, feloniously, and of his malice aforethought kill and murder William R. Pugh, against the peace and dignity of the state of Wisconsin." Upon the application

of the defendant, on the ground of the prejudice of the judge, the venue was changed to Rock county, and the trial was there had.

It is stated in the brief of the counsel for the defendant that on the first day of the trial, while the jurors were being drawn and at the time when the court adjourned for dinner, eleven jurors, among others, had been examined as to their qualifications, and had not been challenged but apparently accepted by both parties; that when the court announced its intention to adjourn, the counsel for the defendant requested that the jurors who had been accepted be kept together in the custody of an officer; that the court refused the request and adjourned the proceedings for two hours; and that on the coming in of the court in the afternoon one of the jurors was excused on account of illness in his family, but the remaining ten jurors, with two others, were impaneled as the jury for the trial of the case.

The facts as they appeared from the evidence given on the trial are sufficiently stated in the opinion. The court instructed the jury, among other things, as follows:

"The law regards human life as one of the most sacred of all interests committed to its protection; and there can be no successful setting up of self-defense unless the necessity for taking life is actual, present, urgent; unless, in a word, the taking of his adversary's life is the only reasonable resort of the party to save his own life, or to save himself from great personal injury."

"If you find from all the evidence in this case, beyond all reasonable doubt, that the defendant shot William R. Pugh, thereby causing his death, from a premeditated design to effect his death, then, no matter what the provocation was, or what the surrounding circumstances were, unless such shooting was justifiable, as explained in these instructions, he is guilty of murder in the first degree."

"While the law requires, in order to constitute murder in

the first degree, that the killing shall be wilful, deliberate, and premeditated, it does not require that the wilful intent, premeditation, or deliberation shall exist for any particular length of time before the crime is committed. It is sufficient if there was a design and determination to kill distinctly formed in the defendant's mind before he fired the fatal shot or shots which caused the death of William R. Pugh. And in this case, if you find from the evidence, beyond all reasonable doubt, that the defendant, at any time before firing the shot or shots which caused the death of William R. Pugh, had formed in his mind a wilful, deliberate, and premeditated design to take his life, and that such shot or shots were fired in furtherance of such design, without any justifiable cause therefor, as explained in these instructions, then you should find him guilty of murder in the first degree."

"On the question of design or intention, I instruct you that the law presumes that a reasonable person intends all the natural, probable, and usual consequences of his act; that when one person assaults another violently with a dangerous weapon likely to kill, not in self-defense and not in sudden heat of passion caused by provocation apparently sufficient to make passion irresistible or involuntary, and the life of the party thus assaulted is actually taken in consequence of such assault, then the legal and natural presumption is that death or great bodily harm was intended, and in such case the law implies malice and such killing would be murder."

Exceptions were taken to all the portions of the charge above quoted, except that contained in the first paragraph.

The jury found the defendant guilty of murder in the first degree. A motion for a new trial, on the ground, among others, that the verdict was contrary to law and the evidence, was denied, and the defendant was sentenced to imprisonment for life in the state prison.

*W. H. Ebbets*, for the plaintiff in error, argued, *inter alia*, that in the assault of a powerful man upon a weaker the necessity of taking life in self-defense will be more easily discoverable than in an attack by one man upon another under more equal circumstances. The probable ability to defend without fatal recourse must depend upon the means and power of defense in the assaulted. *Comm. v. Seibert*, 2 Wharton's Crim. Law (7th ed.), sec. 1027, note; *State v. Benham*, 23 Iowa, 154; *Hurd v. People*, 25 Mich., 405. If from all appearances, and from the nature of the attack made upon him, the defendant has reason to fear great personal injury, and that there is imminent danger it will be inflicted, he has a right to resort to extreme measures of defense, even though it should afterwards turn out that, for some reason he did not know at the time, there was no real danger. *Shorter v. People*, Horr. & Thomp. Cas. Self-Def., 256; *Campbell v. People*, 16 Ill., 17; *State v. Martin*, 30 Wis., 225. In this case the evidence fails to show "a premeditated design," and there is absolutely no evidence of express malice. Some very able courts, in neighboring states, are becoming more and more dissatisfied with the doctrine that malice is to be presumed from the proof of killing, without additional evidence; and especially so in cases where the claim is made upon any just grounds that the homicide was committed in self-defense. *Stokes v. People*, 53 N. Y., 164; *Tweedy v. State*, 5 Iowa, 433; *Maher v. People*, 10 Mich., 210; *State v. Morphy*, 33 Iowa, 270; *State v. Porter*, 34 id., 131. The instruction that there could be no successful setting up of self-defense unless the necessity for taking life was *actual*, etc., was erroneous. *State v. Collins*, 32 Iowa, 36; 1 Bishop on Crim. Law, 385; Wharton on Homicide, 407; Horr. & Thomp. Cas. Self-Def., 104, note; *Pond v. People*, 8 Mich., 150; *State v. Sloan*, 47 Mo., 604; *Shorter v. People*, 2 N. Y., 193; *Campbell v. People*, 16 Ill., 17; *Dyson v. State*, 26 Miss., 362. To the point that in a

capital case the court will consider objections to the charge, though no formal exceptions were taken, counsel cited: *State v. Huber*, 8 Kan., 447; 16 Ala., 781; *State v. Johnson*, 40 Conn., 136.

For the defendant in error a brief was filed, and there was oral argument by *J. T. Fish* and *H. A. Cooper*.

ORTON, J.   To determine the question whether a new trial ought to have been allowed on the motion of the defendant, on the evidence or the merits of the case, and in order to make the exceptions to the charge given and the instructions refused intelligible, a concise statement of the material facts becomes necessary.   The deceased was a large and strong man, and had been a captain on the lakes.   The defendant was a professional gambler in the city of Milwaukee, and a small man.   They had been acquainted, and, so far as known, were friends.   The defendant had made several bets with different parties on the result of a walking match in the city of Racine, and one bet was made with the deceased. The result had been determined, and the person upon whom the defendant had bet had lost the match by the determination of the proper gambling authorities, and he had paid all of his bets thereon, without objection, except the one with the deceased.   The parties, with others, had met in the saloon or bar-room of the Huggins House, of said city, and the deceased had treated the company over his success, and then for the first time was notified by the defendant that he would not pay said bet, on the ground that it was unfairly determined.   There was some dispute about it in the saloon or bar-room, and the defendant positively refused his assent to the money claimed to have been lost on the match being paid by the stakeholder to the deceased.   Some rough language was used by the deceased concerning the conduct of the defendant in relation to his refusal to pay his bet fairly lost, and he expressed his willingness to chastise him for it,

if he was not a mere boy, or so inferior in size and strength. Thereupon the defendant said he was going to bed, and told the stakeholder not to give to the deceased his money, although he might the money staked by the deceased. He went up stairs to the office, registered his name, and started for the third story of the hotel to go to bed, although he had not ascertained the number of his room. He was evidently under considerable excitement. After leaving the bar-room he came back and sat down, but said nothing further, except to refuse to consent to the payment of the bet as before. When he had arrived at the head of the first flight of stairs, the one leading from the bar-room to the hotel office, he was overtaken by the deceased, who insisted that he should go down and settle up the matter. The defendant testified that he said he should "go down and take a drink." He refused, saying that he was going to bed. The deceased then caught hold of him, and with a profane threat insisted that he should go down to fix the matter up, or at least that "he should go down and take a drink." The defendant resisted, and caught hold of the railing leading to the foot of the stairs of the third story, and in the open room of the office. A friend of the defendant came up and separated them, and endeavored to induce the defendant to go down into the bar-room. The defendant was by him separated from the deceased, and was near the foot of the stairs leading into the third story, where he had expressed an intention of going to bed. He was then eight or nine feet from the deceased. He then drew a pistol from his hip pocket, according to his own evidence. Before going to Racine on this occasion he had armed himself with a pistol known as "the English bull-dog," of .44 caliber, and self-cocking, with five chambers, and went there in company with gambling friends, one of whom was the stakeholder, by his particular request. According to his own evidence he fired two shots into the floor towards the deceased.

When he drew his pistol his friend rushed up and grappled with him, saying, "What are you doing?" This seemed to attract the attention of the deceased, and he rushed upon the defendant and grappled him. The friend fled, and the defendant discharged one shot into the abdomen of the deceased, and another into his side slightly in front, and the last shot was obviously made when the deceased was on the retreat toward the head of the stairs leading down into the bar-room. The last two shots were both fatal. The deceased had not personally injured the defendant in the struggle, except, perhaps, that one button had been torn from his coat, and he was unarmed. When the first shots had been fired the deceased threw up his arms and said he was unarmed. In all this controversy about the bet the defendant was evidently silent and morose, while the deceased, in a rough and insolent manner, was insisting upon the payment of his bet, with an attempted exhibition of sufficient physical power to compel him at least to go down into the bar-room and talk the matter over or to take a drink with him. They knew each other, and were competent to judge to some extent the significance, meaning, and intention of each other's actions. The deceased was evidently a large, strong sailor on the lakes, rough, hearty, generous, and full of lusty life, like those of his profession generally. The defendant was small, but not necessarily weak, engaged in a business requiring great coolness and determination, and subject to fearful risks both from his associates and the penalties of the law. These characteristics cannot be ignored in passing intelligent judgment upon their actions; especially in such a fatal collision, where one was deliberately armed and the other habitually unarmed. There is much other evidence of facts, but they were mostly preliminary and subsequent to the immediate scene of the shooting, not affecting the material issue or the legal character of the conduct of the parties, and not, therefore, necessary to be noticed. These facts

seem to be incontrovertibly established, and we can therefore intelligently apply the law to them in respect to the legal conclusion of what crime, if any, had been committed, and to the instructions of the court to the jury.

We have carefully read all the testimony, and we cannot resist the conclusion that the verdict was fully warranted by the evidence. In such a case, unless there were material errors in practice, or the judgment of the jury was improperly controlled or misdirected by instructions upon the law, we have no right to disturb the verdict. The first point made, that the verdict is contrary to the evidence, is thus disposed of.

The point of error, that eleven jurors, accepted by the parties, were allowed to separate before the panel was filled, is not supported by any authority, and it is not perceived how it could have affected the verdict, unless it was made to appear that in consequence of their separation the jurors so accepted had been improperly influenced, the knowledge of which fact had not come to the defendant before the trial. If they had become disqualified by improper communication with others, by their separation, and the fact was made known before the whole jury had been accepted, they could have been challenged for such cause. But it does not even yet appear that the defendant was at all prejudiced by this practice, and, in the absence of all adjudications of the question, we are not prepared to condemn it. If a full jury, regularly impaneled, had been allowed to separate, even against the correct practice, if the defendant had not been prejudiced thereby it would not be such an error as should reverse the judgment. *Crockett v. State,* 52 Wis., 211.

The main errors assigned are upon the instructions of the court to the jury, mostly relating to the various degrees of criminal homicide supposed to be involved in the case.

It has been recently decided by this court in *Knoll v. State,* 55 Wis., 249, that we could not consider any errors in the

charge of the court, even in cases of murder, unless exception was duly taken as in other cases. We shall therefore decline to consider the charge of the learned judge, in which he says that the plea of self-defense cannot be successfully interposed "unless the necessity for taking life is *actual, present, urgent;* unless, in a word, the taking of his adversary's life is the only reasonable resort of the party to save his own life, or to save himself from great bodily injury." But if we were allowed to consider this part of the charge, we might suggest that this last clause, that it must be " the only *reasonable* resort of the party to save his own life," takes away the objection that " the necessity must be *actual,"* etc. This charge, as a whole, is within the exact terms of the statute. Besides, the very language of the statute of self-defense had been given already at least once, and it was given afterwards, so that the jury could not have possibly misapprehended it. This clause of the instruction would leave the jury to determine by its " reasonableness " " the *actual necessity*" of taking life, and hold the accused to the same rule which is in the statute of self-defense.

This part of the charge was excepted to, viz.: " If you find, therefore, from all the evidence in this case, beyond a reasonable doubt, that the defendant shot William R. Pugh, thereby causing his death, from premeditated design to effect his death, then, no matter what the provocation was, or what the surrounding circumstances were, unless such shooting is justifiable, as explained in these instructions, he is guilty of murder in the first degree." This instruction presupposed the very element under our statute which makes a homicide murder in the first degree. *Premeditation* in our statute is precisely the same as express malice and malice aforethought at common law. *Hogan v. State,* 30 Wis., 428; *S. C.,* 36 Wis., 226. And when all the necessary ingredients of the crime of murder in the first degree are present, of course it cannot be mitigated or changed by any other

circumstances or conditions. When there are circumstances which lessen the offense to a lower degree of murder or to some degree of manslaughter, the element of *premeditation* or malice aforethought must necessarily be absent. *Jones v. Comm.*, 75 Pa. St., 403; *State v. Johnson*, 2 Green, Crim. R., 487. A premeditated killing is murder in the first degree, and can be nothing else, because it implies the lying in wait, and malice aforethought, and settled design. It is wilful, deliberate, and expressly malicious, and, of course, these elements exclude all extenuating circumstances to reduce it below the first degree. The statute makes no exceptions or conditions, and the courts can make none. This is so in reason as well as by authority. Murder in the first degree is not defined at all, unless by this language. Whart. on Hom., 174; 1 Bishop on Crim. Law, 603.

It is said in the brief of the learned counsel of the plaintiff in error that the court refused to give an instruction asked, "that if the defendant acted from reasonable and honest convictions at the time of the killing, he could not be held responsible criminally for a mistake in the extent of the actual danger." We can find no such instruction asked, in this language or any other of the same meaning, but in so large a record we may have overlooked it. But it will readily be perceived that such an instruction does not add anything to or change the statutory definition of self-defense, which was given no less than three times in the charge of the court. The language of the instruction, that the defendant must have acted from *reasonable* as well as *honest* convictions at the time of the killing, in order not to be responsible criminally, brings the instruction within the precise language and meaning of the statute. The appearances must have given the defendant *reasonable* ground to apprehend that such design would be accomplished; not that they caused him to apprehend the danger, reasonably or unreasonably, because to ascertain such a state or condition of

the mind of the defendant would be impossible. The language of the statute is: "When there shall be *reasonable* ground to apprehend a design to commit a felony, or to do some great personal injury, and there shall be reasonable cause for believing that there is imminent danger of such design being accomplished," etc. The statute precludes any other criterion than *reasonable* ground to apprehend and *reasonable* cause for believing. The statute cannot be extended by construction or by other language, and a trial court cannot do better than to instruct the jury in the precise language of the statute, as the learned judge did in this case.

By the authorities cited by the learned counsel of the plaintiff in error, this distinction is clearly made. In *Campbell v. People*, 16 Ill., 17, the language "*reasonable* and well-grounded belief, *reasonable* and honest convictions," is used, and how "other judicious men" would have acted under like circumstances is made the test. In *Bohannon v. Comm.*, 1 Green, Crim. R., 613, the language is, "having good reason to believe." In *Rippy v. State*, 2 Head, 217, the language is, "the danger must either be real, or honestly believed to be so;" but is qualified by the language in its connection, "and such belief of danger must be founded on *reasonable* grounds." In *Pistorius v. Comm.*, 84 Pa. St., 158, the language is, "reasonable belief of danger." The celebrated *Selfridge Case*, which is generally cited to justify the most liberal rule of self-defense, and which has been criticised by some courts and law writers as going too far, lays down the rule that "appearances of danger must be sufficient to convince a *reasonable* man." The note in Horrigan & Thompson's Cases on Self-Defense, 104, which follows a critical examination of the *Selfridge Case* and several other cases in which the same rule of self-defense and of fleeing and retreating was applied, is very valuable as showing a general uniformity in late cases in the application of this rule. The defendant

may act from appearances of danger, but there must be reasonable ground to apprehend the danger, and reasonable cause to fear. Whart. on Hom., 213. In *State v. Collins*, 32 Iowa, 36, almost the exact language is used as in this case,— " that there must be *actual* and urgent danger; not that it actually exists, but if it does in defendant's comprehension as a *reasonable* man." The similar language used in this case was qualified by reading the statute in connection with it. In *Pond v. People*, 8 Mich., 150, it is said " the law does not require actual necessity, if appearances so indicate to give him *reasonable* cause for a belief that " it is actual and imminent." In *State v. Sloan*, 47 Mo., 604, " there must be *reasonable* ground to believe." In *Pierson v. State*, 12 Ala., 149, " there must be a well-grounded apprehension of imminent danger to life or limb." In *State v. Kennedy*, 20 Iowa, 569, " if there is no reason for belief that the danger is actual and imminent, it is no justification." In *State v. Thompson*, 9 Iowa, 188, " it is not sufficient that one believed he was in danger unless such belief was *reasonable.*" A great number of other cases might be cited in which courts have endeavored to follow the rule in the *Selfridge Case* in its true meaning, and in all of them with the same qualification, that the apprehension or belief or appearances must be *reasonable*, and such is now believed to be the universal rule. In this very full and explicit charge of the learned judge, this qualification is made prominent in connection with any language implying that the danger must be *actual* or *urgent*, and the jury must have so understood it.

The exception to that part of the charge, that the law does not require " the wilful intent, premeditation, or deliberation need not exist for any particular length of time before the crime is committed," etc., is disposed of by approval in *Roman v. State*, 41 Wis., 312.

Much stress is laid upon the fact that the deceased was restraining the personal liberty of the defendant; but, even

if this was so, the premeditated killing of the deceased could not reduce the homicide below murder in the first degree, or the killing without premeditation below murder or manslaughter. The plea of self-defense could not be made on the mere ground of restraint or imprisonment without warrant. *Goodman v. State*, 4 Tex. App., 349; *Rafferty v. State*, 69 Ill., 111.

It is claimed that the court erred in charging the jury "that a reasonable person intends all the natural, probable, and usual consequences of his act;" and again, "if a reasonable man uses a deadly weapon, and life is taken, he is presumed to intend the natural consequences of his act and would be guilty of murder." The first member of this proposition is strictly correct in all moral action or human affairs, and is recognized by this court in *Gillet v. Phelps*, 12 Wis., 392, and is an axiom of the law. The last clause is but an application of the principle of homicide with a dangerous weapon likely to kill. In *Thomas v. People*, 67 N. Y., 218, it was held that "to use a deadly weapon against a vital part is presumptive evidence of murder." And in *Green v. State*, 28 Miss., 688, it was held that "to use a deadly weapon not in self-defense is evidence of malice." We think the instruction strictly correct in reason as well as supported by the authorities. This principle embraces also the eleventh exception in relation to the charge of the court, as to an assault with a deadly weapon likely to kill, violently and not in self-defense, etc., and the life of the party is actually taken, that the legal and natural presumption is that death *or great bodily harm* was intended, and that in such case the law implies malice and such killing would be murder." The only reasonable criticism to this part of the charge is that it was too favorable to the defendant. The words "great bodily harm" should have been left out; for the presumption in such case would be at least the taking of life, and, the intent being presumed, by the use of the deadly weapon, it

would be murder in one of its degrees, unless mitigated to manslaughter by other evidence. If a weapon likely to kill, and which did kill, was used, the intent is presumed that such a natural and reasonable consequence would follow the assault, and nothing less. This injection into the legal proposition of a consequence less than death, was clearly favorable to the defendant, and he cannot complain of it.

The only other error complained of is that the court virtually charged that if the killing was *intentional*, no matter what the provocation, etc., the defendant is guilty of murder in the first degree. The court charged no such law. The learned counsel confounds the *intentional* with a *premeditated design* to effect the death of the person killed, and they are very far apart. The homicide may be intentional in murder in the second degree and manslaughter in the third degree, but not with a *premeditation* necessary to murder in the first degree. The error rises upon the brief of the learned counsel by a confusion of terms. Intentional killing may be even justifiable or excusable, but a killing by premeditated design to effect the death of the person killed is always murder in the first degree.

Lastly, the point is made that inasmuch as the deceased, after the first exhibition of the defendant's deadly weapon and its first two discharges, grappled with him to prevent its further use upon himself, that he then might have reasonably apprehended death or great bodily injury in case he did not succeed in killing him. This would be the most striking and fatal violation of the principle that a man cannot take advantage of his own wrong, which could be imagined. If one points a loaded gun at another, and the other grapples with him to prevent the shooting and is shot, it is murder. *State v. Benham*, 23 Iowa, 155.

The points of exception are made rather confusedly, but these views are believed to comprehend all of them. It is a case of much importance to the defendant, and we have en-

deavored to give all the questions raised for error a careful consideration, in view of the authorities. We may have fallen short of this duty, but it may properly be remarked that the evidence clearly justified, in our opinion, the verdict of murder in the first degree, and any seeming errors in the charge of the court could not have prejudiced the defendant. Without, however, intimating that there are even any such seeming errors to us, we think the long and elaborate and very able charge of the learned judge is singularly free from error, which is the more remarkable and creditable on account of its great length. The reading of the statute itself, which so clearly defines the different degrees of criminal homicide with so much particularity, as well as justifiable or excusable homicide, it would seem to be sufficient and especially safe to read to the jury the statute, with the addition, perhaps, of pointing out, by comparison, the differences in the degrees, as the learned judge did in this case. But it is great praise when the judge adopts different from the statutory language and uses that of the same meaning.

The cause was very ably tried by the learned counsel on both sides, and especially by the learned judge, and the various points of exception have been ably and fully presented and argued by the learned counsel in this court.

It seems clear to us that, from the evidence, the defendant could not have properly been convicted of anything less than murder in the first degree, or should not have been convicted at all. The characteristics of the shooting stand boldly out, and indicate a deliberate and predetermined and premeditated design to kill. The first shots were fired when the deceased was distant from the defendant eight or nine feet, and when the deceased had desisted from any assault or annoyance of the defendant, and the last of the two fatal shots was fired when the deceased was evidently on the retreat and making an effort to get away from the danger. When the deceased, after having his attention called to the

defendant's drawing his revolver, from the ejaculation of his friend, "What are you doing?" threw up his hands and said, "I am unarmed," and the defendant then being separated from the deceased about nine feet, and standing at the foot of the stairs leading into the third story to which he pretended he had started for his bed, and could have readily gone up those stairs if he had chosen to do so without any hindrance from the deceased, who was so far from him, and then turned around and fired deliberately four shots *towards* the deceased, even if two of them were fired into the floor, as he pretends, and pursued the deceased and shot him dead, while he was evidently on the retreat, can this be less than murder in the first degree? We think not, and cannot, therefore, order a new trial in the case.

*By the Court.*— The judgment of the circuit court is affirmed.