TERRILL, Plaintiff in error, vs. THE STATE, Defendant in error.

*January 19 — February 23, 1897.*

*Homicide: Manslaughter: Murder.*

1. Upon a trial for homicide, the court, after charging, as requested by the defendant, that, if the defendant unnecessarily killed the deceased while resisting an assault upon him with intent to do him great bodily injury, they might find him guilty of manslaughter in the second degree, proceeded of its own motion to charge them that "if the defendant was not justified by the law of self-defense in shooting and killing Q. (the deceased), and the killing of Q. was therefore unnecessary and unlawful; and if you are convinced by the evidence beyond a reasonable doubt that when he shot and killed Q. he did so pursuant to an *intent then distinctly formed* in his mind to kill Q., you cannot lawfully find the defendant guilty of manslaughter in the second degree, for the defendant in such case, if he killed Q. from *premeditated design* to kill him, is guilty of murder in the first degree." *Held,* that the latter instruction was manifestly erroneous in failing to distinguish between the intentional and unnecessarily killing under the circumstances stated in sec. 4351, R. S., and a killing when perpetrated by premeditated design to effect the death of the person killed, which would be murder in the first degree. MARSHALL, J., dissents.

2. Where, in such a case, the evidence would have sustained a verdict finding the defendant guilty of manslaughter in the second, third, or fourth degree, in case the defense of justifiable homicide was not substantially made out, *held,* that it was the duty of the court to accurately give to the jury the law of whatever degree of felonious homicide the evidence tended to prove; and to refuse to do so, and in effect to charge them that they must acquit the defendant or else convict him of either murder in the first degree or manslaughter in the second degree, was error.

ERROR to review a judgment of the circuit court for Iowa county: GEO. CLEMENTSON, Circuit Judge. *Reversed.*

The plaintiff in error was tried and convicted, in the circuit court for Iowa county, of the crime of murder in the first degree, upon an information charging him, in the usual form, with having killed and murdered one John Quirk, March 17, 1894. After sentence, he sued out a writ of error.

For the plaintiff in error there was a brief by *Spensley & McIlhon,* and oral argument by *Calvert Spensley.* They took the ground that no such premeditation was shown in this case as justified the jury in finding the defendant guilty of murder in the first degree. The blow given by the deceased to the defendant must have so affected his mind as to render cool deliberation and premeditation impossible. In such a case *express malice* must be shown by extrinsic evidence. *Bivens v. State,* 11 Ark. 455. The defendant acted in self-defense. The force used by him was not so disproportionate to his apparent danger as to show wantonness, revenge, or a malicious purpose to injure his assailant. *Stewart v. State,* 1 Horr. & T. Cases on Self-defense, 193; *Comm v. Drum,* id. 188, 190. The killing was unintentional,— the defendant had no chance to take aim. *Schlect v. State,* 75 Wis. 486; *Keenan v. State,* 8 id. 132; *Perkins v. State,* 78 id. 551, 558; *State v. Bloedow,* 45 id. 279. The court's refusal to instruct the jury that they might find the defendant guilty of manslaughter in the second degree, under sec. 4351, R. S., was error for which the judgment should be reversed. *Doherty v. State,* 84 Wis. 152; *Giskie v. State,* 71 id. 612.

For the defendant in error there was a brief by the *Attorney General* and *John L. Erdall,* Assistant Attorney General, and oral argument by the *Attorney General.*

PINNEY, J. The principal question to be determined is whether the circuit court in its charge to the jury, in point

of law, fairly submitted the case to their consideration, and properly denied the several requests of the defendant's counsel to instruct the jury as to the law of manslaughter in the second, third, and fourth degrees. It was conceded that the defendant shot and killed Quirk at the time and place alleged in the information, and the contention at the trial was what degree of criminality, if any, on the part of the defendant, ensued in consequence of such killing.

The circumstances were, in substance, that the defendant, the deceased, Stephen Tonkin, John Grace, and William Jackson, the bartender at the saloon of William Collins, where the killing occurred, had spent the entire night of March 16, 1894, and until 5 o'clock in the morning of the 17th, in drinking whisky and beer, and in playing cards for the drinks. They had drunk to excess, and none of them had had any sleep. Jackson, the bartender, then set up a saloon lunch, and they all partook, and still remained at the saloon, a room about forty-one feet long and fourteen feet wide. About half past 9 or 10 o'clock, William Clark, a young man about seventeen or eighteen years of age, and one William Smith came into the saloon. The latter, having some green ribbon, gave pieces of it to Clark and to the defendant, which they pinned on their coats in honor of St. Patrick's day. Clark pulled the ribbon off the defendant's coat, at which he was somewhat offended, and after some angry words between them he threw Clark down, and a scuffle ensued between them. Jackson pulled the defendant off Clark, and he attacked Clark again, Jackson again interfering to pull him off.

Clark testified, in substance, that the defendant had him down, and hurt his ear, kicked at him, and kicked him in the stomach, and some words ensued in relation to a claim for rent the defendant asserted. Thereupon Quirk, the deceased, asked the defendant what he was pitching on him (witness) for, and he and Quirk got to scuffling. That Quirk said to

him: What did he jump on me for? It was not my fault that my folks owed him rent; and that he had no right to pick on me for the rent as long as I did not owe it to him; "and they started to scuffle again." This occurred in the front part of the saloon. "And finally the deceased went back in the saloon to a card table, with Smith, and sat down. The deceased asked the defendant if he wanted to fight witness, and the defendant pulled off his coat, and said to witness, 'Come out in the back yard with me.' The deceased asked witness if he wanted to fight, and I said, 'No, Jack; I am no match for him at all;' and Jack said, 'All right,' and went into the back part of the saloon, with Smith, and sat down at a card table."

Another witness, one Minor, testified that he came into the saloon with one Ross, and the defendant and deceased were scuffling against the west wall, about five or six feet from the front door. Defendant's back was against the wall, and deceased was in front of him, and there were two between them; that he heard defendant say, just as he went in the door, "Hold on, Jack; I don't want to scrap with you," and the deceased (Jack) said, "All right," and then Smith and Jack went back and sat down on a card table. Ross testified, in substance, the same, that when they went into the saloon the defendant and the deceased were scuffling. "There was one blow struck. The deceased struck the defendant a tolerably hard blow in the chest somewhere, and the defendant was hollering something,— that he didn't want to fight with him. The deceased did not say anything. They stopped him, and he went and sat down in the back end of the saloon."

Smith testified that in this struggle the deceased got mad, and struck the defendant in the face, and they had hold of each other, when he and Jackson interfered, and he and Grace advised the deceased not to have any quarrel, and got him to go and sit down. Jackson and Grace, in their testi-

mony, confirm the statement of the previous witnesses that
there had been quite a struggle between the defendant and
the deceased before the latter went to the back part of the
saloon with Smith, and during which the defendant insisted
that he did not want to scrap or fight with him.   Ross fur-
ther testified that when the deceased sat down in the back
part of the saloon the defendant came up to the side of the
bar, by the cigar case, and was talking to somebody, and
"he put his hand in his hip pocket, and took a revolver out,
and turned it over in his hands, and then he said, 'The first
one that jumps me again will get the contents of this,' and
then he put it in his coat pocket; that is all I heard him
say."

The witness Minor testified that after the deceased sat
down the defendant said, when he took out the revolver:
"By God, the next man that jumps me, I'll fix him.   I'll
put seven holes in him; and it won't be the first, nor the
second, nor the third, nor the fourth, nor the fifth;" that
he (witness) walked out the door, and stayed there a minute,
and then came in.   Clark testified that the defendant said,
as he took out the pistol: "The next man that jumps me,
I will shoot; I would as lief shoot as look at him; that
nobody was going to jump him;" and then witness went
back in the room, and as he passed the deceased he said
to him, "Don't jump *Steve* [defendant]; he has a revolver;"
that he did not think the deceased heard him, and he
(witness) "passed on out the back door, and in a little while
came back again," and spoke to Minor about the way the de-
fendant had used him, and walked in a little further, al-
most to the end of the counter; that the defendant had
come back to the bar, and the deceased (Jack) was sitting
with Smith, and the defendant said, "Jack, come up here,"
and the deceased said to Smith, "I believe that man ad-
dressed me."   The defendant said, "Jack, what did you
jump me for?" and beckoned, as indicated by witness, and

Jack again said, "I believe that man addressed me." Smith then told him to sit down, and be quiet, and Jack said again, "I believe that man addressed me," and he walked up, and the defendant said to him, "What did you jump on me for?" Then he (Jack) said: "It is against my principles to see a man jump on a boy. You ought to know better. You weigh 180 pounds, and he is only a boy of seventeen. He is no match for you at all." And he said, "No, but I am as heavy as you are," and then they clinched. Jack struck him, and knocked him back by the window, and grabbed at him again. The defendant said, "I don't want to scrap with you; I don't mean you;" and then Grace jumped between them, and held them out, and they scuffled around, when the defendant jerked loose, and ran up with the revolver, and said, "Jack, what did you hit me for?" that just then Mrs. Collins, or her sister, came in the back way, and he heard somebody say, "For God's sake, *Steve*, don't!" that he started to look around, and saw the first shot fired; saw Grace dodge, and he saw who shot, and he then ran out. He testified that when the deceased struck the defendant, *Steve*, by the counter, he did not fall, but staggered, and went back, and deceased went up and grabbed him by the arm, and the defendant said, "I don't mean you; I don't want to scrap with you;" and then Jackson, the bartender, came around, and Grace jumped between them. That he did not think that defendant would shoot. He had his foot out towards deceased, and the latter had hold of the defendant, and was following him up, and the defendant was backing up, and both of them were scuffling to get away from Grace; but whether the defendant jerked away, or Grace let him go, he could not say. That Jack had hold of defendant, and was following him up, and the defendant was backing up, and he said, 'What did you hit me for?" and then he shot, and witness started to run, and as he got down the steps he heard three or four more shots fired. That it was a continuous scuffle from the

time the deceased struck the defendant at the counter and knocked him back.

The witness Minor gave substantially the same account of the transaction as Clark, and testified that when the defendant said to deceased at the counter, "You and I are about equal," the deceased whirled around, and struck defendant along the side of his face, and he staggered back, grabbed the show case as he went, and deceased followed him, when the defendant stepped up or back in a window like (into a recess, with a bench about twenty-two inches high, and about twenty-seven deep) with his left foot out, and said, "No, no, Jack; I don't mean it that way; I don't want to fight you;" but Jack seemed to be coming at him, and the defendant kicked him with the flat of his foot in the stomach. That Jack grabbed him, and they swung out. Grace ran out, and got in under them, and Jackson got hold in some way, and the four were scuffling around, and got over against the west wall. That it was all done quickly, and when the defendant made a motion as if to shoot, Jack ducked behind Grace, and when he raised up the defendant shot. That he thought Grace was shot, as he ducked down. Soon the defendant fired again, and Jack dropped down, and ran in, and got his hands around defendant's waist, and his head up against his stomach, and pushed him right back. That as they came down the saloon he (witness) had to jump out of the way, and he ran for the door, and just as he was going out he looked back, and saw Jack down right on his face. That when Jack grabbed the defendant around the waist, and had his head up against the defendant's stomach, the latter had the revolver up under him shooting as fast as he could. When witness came back into the saloon, he saw Jack lying on the table. He was just alive; made two or three gasps. He testified that Jack did not have hold of the defendant when he fired the first shot, because he saw the defendant walking around Grace before he shot; but

this is contrary to the testimony of other witnesses, though apparently corroborated by Clark. Smith testified that when the shot was fired they seemed to have hold of each other, and Grace was between them. The defendant drew the revolver, and held it over Grace's shoulder, and began shooting.

Jackson, the bartender, testified to the striking of the defendant by the deceased at the bar, and that the blow knocked the defendant back about seven feet; that Grace jumped in, and witness jumped over the bar, and caught deceased by the back. That the latter was reaching for the defendant, who was up in the window, and he put out his foot and pushed the deceased back, and that he and Grace managed to get them out of the window, but they still had hold of each other, and swung around to the west wall. That defendant said he did not want to have any trouble, or something of that kind; and the deceased was trying to get at him all the time. The defendant said, "Jack, you struck me," and pulled the gun and shot, but he did not take aim. The pistol was pointed over Grace's shoulder. Grace stepped out, and deceased turned and ducked down, and tried to catch the defendant by the legs, and caught him by the waist, and the defendant shot a second time. He was then bent down and under the deceased. He had hold of deceased, and was shooting and backing up at the same time, and deceased was trying to get a better hold of him. Five shots were fired. After the fourth, the deceased fell to the floor, face down, and the defendant shot at him as he lay. That he did not think he took any aim. If he did, it was awful quick. That he was pointing the revolver towards the deceased. After the last shot, the defendant struck the deceased twice on the back of the head with the butt of the pistol. He further testified that deceased had hold of defendant when the first shot was fired; that he then let go, and grabbed for defendant's legs, and crowded him back,

Terrill vs. The State.

and the defendant was trying to crowd deceased back, but the latter was too strong for him, and was pushing him back all the time; that after the first shot the whole affair lasted not more than four or five seconds. The witness Grace testified to the blow at the counter, and that when the first shot was fired he was standing between the parties, trying to keep deceased from the defendant, and had both hands on deceased, who was shoving up defendant, and going for him; that the first shot was fired over the shoulder of the witness; that he then dodged out, and deceased came around him, and caught defendant by the legs, and then witness went out of the door; that the deceased never broke his hold until after the first shot was fired; that there were three or four shots fired in rapid succession as he was going to the door, with practically no interval between them.

The defendant testified, among other things, that he had never had any previous difficulty with the deceased, and had known him since the previous November. Had heard him say he would not be afraid to stand up before John L. Sullivan, if he was a little heavier. Heard him tell Collins that he could not go back to Chicago; that he had mashed a man all to pieces there. That it was about some money he had won of a fellow, and he had jumped him about it, and he struck the fellow, and the fellow got his (Quirk's) little finger in his mouth, and he mashed him while the fellow chewed his finger. He said he thought it would go pretty strong against him; he had got into so much trouble there before; and that his mail was addressed to Curry, so they would not know where he was. That during the altercation with Clark about the ribbon the deceased jumped up, and said: "You God damned big duffer, let that boy alone. Why don't you take somebody of your size?" and "struck me here on the ———. That a second or so after, I took out the revolver, and said that the next man that hit me would get some hot lead;" and that he did this to scare

him. That he knew the deceased was a better man than he, and was afraid of him. That after deceased struck defendant the first time, he (defendant) said: "Don't hit me, Jack. I don't want any trouble with you;" and repeated it four or five times. The deceased was then back by the stove, and Smith was getting him to put his coat on. That he did not attempt to strike back, for he knew he was not able for him. That the deceased got up, and came to the bar, and struck him the blow on the temple as hard as he could strike. That the blow stunned him, and knocked him back into the window recess. That the defendant put up his foot when he was down in the recess, and said "Jack, keep away from me; I don't want any trouble," and the deceased grabbed him by the coat, with both hands, and pulled him off the window seat, and Grace and Jackson were trying to keep him off. That deceased was mad, and he was stunned and in fear, and was afraid of his pounding and mashing him, and doing him bodily injury. That he was pulling back from deceased, and trying to get away from him, but could not. That he had no intention of resenting his attack if he could have got away from him. That the deceased still held him by the coat, and then defendant drew the revolver, and fired upward beside him (indicating), and into the wall. That he did not intend to hit him, and did not take any aim; he intended to scare him. That then Grace dodged out, and deceased dodged down, and grabbed the defendant around the waist, and he was forcing him back, and then he shot again. The defendant described the situation and the subsequent struggle and shooting substantially as the witness Jackson did, and said the deceased did not let go of him until he had pushed him back against the end of the bar, when the fourth shot was fired, and deceased fell down; and that when he shot him the last time he did not know that deceased was seriously hurt, and, as the crowd had gone, he feared he would get up and pound him. Will-

iam Collins testified to what deceased had said to him about his Chicago difficulty, substantially as already stated. The evidence tended to show that the parties had drunk to excess during the night, and were under the influence of intoxicants. There was evidence that when the defendant was arrested there was a scar on his left temple, which remained there from ten days to two weeks. It was from a half to three quarters of an inch long, and seemed as if it was cut, not to the bone, but through the skin.

1. The evidence tends to show that in the altercation that took place between the defendant and Clark, and to which the deceased made himself an aggressive party as against the defendant, the latter made no assault or attack upon the deceased, but declared frequently and explicitly that he did not want to "scrap" or fight with the deceased, and this, too, although the defendant suffered from him violence and even blows. After the struggle to which Clark was a party was ended, and after the deceased came from his seat by the card table to the counter where the defendant was standing, and there dealt him a heavy blow on the temple, which knocked him staggering back about seven feet, to the window recess, where the deceased fiercely pursued him, the defendant still protested that he did not mean that he desired to fight, and said: " Jack, what are you picking on me for?" that he did not want to have any trouble, and called out, "Jack, what did you hit me for?" He put up his foot, when in the window recess, and pushed or kicked his assailant back with the bottom of his foot, when the deceased had seized him violently, with the evident intention of dragging him out, and inflicting further violence on him. Had he intended or desired to kill the deceased, he could have shot him at once, and before the struggle, which took place after he was apparently pulled out of the window recess. After this, the struggle became fierce, but ended quickly, with fatal result.

The evidence also tends to show that the deceased was a formidable and dangerous antagonist, and that the defendant feared him, and wanted to avoid trying conclusions with him, even when he had a loaded revolver in his pocket. Beyond question, after the parties got from the recess in the window, they were greatly excited and in the heat of passion, and the circumstances were such that they might be held to warrant the belief on the part of the defendant that he was then, at least, in peril of great personal injury. The court considered the evidence to be such that it was proper to submit to the jury the question whether the killing of Quirk by the defendant was not justifiable, as committed in the lawful defense of the defendant's person, and gave, at the request of the defendant, appropriate instructions on this subject. The court further charged the jury, at the request of the defendant, and in accordance with R. S., sec. 4351, that "If you believe from the evidence that the defendant unnecessarily killed John Quirk, while resisting an assault by Quirk upon him, with intent to do him great bodily injury, you may find him guilty of manslaughter in the second degree;" but the court, of its own motion, further instructed the jury as follows: "In connection with this instruction, I charge you that if the defendant was not justified by the law of self-defense, as heretofore given you in the instructions asked, and as I shall hereafter give it to you, in shooting and killing Quirk, and the killing of Quirk was, therefore, unnecessary and unlawful; and if you are convinced by the evidence beyond a reasonable doubt that when he shot and killed Quirk he did so pursuant to an *intent then distinctly formed* in his mind to kill Quirk, you cannot lawfully find the defendant guilty of manslaughter in the second degree, for the defendant, in such case, if he killed Quirk from *premeditated design* to kill him, is guilty of murder in the first degree." To this instruction there was an exception. This instruction is, we think, manifestly

erroneous, and in conflict with the language of the statute
itself.   It placed the criminality of unnecessarily killing an-
other, either while resisting an attempt by such other per-
son to commit any felony, or to do any unlawful act, upon
the same ground as the killing of another when perpetrated
from premeditated design to effect the death of the person
killed; and wholly failed to distinguish between the *inten-
tional and unnecessary* killing under the circumstances stated
in sec. 4351, and a killing when perpetrated by *premeditated
design* to effect the death of the person killed, which last is
murder in the first degree.   It certainly was not the inten-
tion of the statute to render one who unnecessarily but in-
tentionally kills his assailant, while resisting an attempt on
his part to commit any felony, or to do any unlawful act
against him, upon the same basis of criminality, as one who
commits murder in the first degree.   It is clear that under
our statute (R. S. secs. 4351, 4363) "a person may intention-
ally take the life of another, and be guilty of manslaughter,
and of that only."   The law was thus expressly stated in
*State v. Fee,* 19 Wis. 562–565; R. S. 1858, ch. 164, secs. 13,
21.   This point was again expressly ruled in *Clifford v. State,*
58 Wis. 477–491.   In that case it was assigned as error that
" the court virtually charged that if the killing was *inten-
tional,* no matter what the provocation,  .  .  .   the defend-
ant is guilty of murder in the first degree;" but this court
said that " the court charged no such law;" that " the
learned counsel confounds the *intentional* with the *premed-
itated design* to effect the death of the person killed, and
that they are very far apart; that homicide may be inten-
tional in murder in the second degree, and manslaughter in
the *third* degree, but not with a *premeditation* necessary to
murder in the first degree.  .  .  .   The intentional killing
may be even justifiable or excusable, but a killing by pre-
meditated design to effect the death of the person killed is
always murder in the first degree."   Sec. 4351 deals with

Terrill vs. The State.

special cases not within the law of murder in the first degree, and it is impossible to resist the conviction that it includes cases of intentional killing, when such killing is unnecessarily committed "either while resisting an attempt by such other person to commit any felony or to do any other unlawful act." The law, having regard to human infirmity, goes upon the ground that a party thus assailed and circumstanced, from weakness of judgment, fear, or other cause may intentionally and unnecessarily kill his assailant in resisting his attempt to commit any felony, or to do any unlawful act; and the criminality of such killing, by the statute, is therefore reduced to manslaughter in the second degree. This view is not in conflict with anything actually decided in *Hogan v. State*, 36 Wis. 226–244. That case involved only questions concerning the law of murder, but by way of illustration the law of manslaughter in the first, second, and third degrees was referred to. The particular section here in question was not cited, nor was there any question before the court in regard to it, and the language of Ryan, C. J., on page 244, clearly shows that his attention was not directed to sec. 4351, for he says: "The definitions of murder in the third degree and of manslaughter in the first, second, and third degrees use the words 'without design to effect death,' thus positively excluding such a design." This is not true as to manslaughter in the second degree, under R. S. 1858, ch. 164, sec. 13, to which sec. 4351 of our present statutes exactly corresponds, but is true as to manslaughter in that degree under R. S. 1858, ch. 164, sec. 12, to which sec. 4350 of our present statutes exactly corresponds. It is probable that in the passage quoted from *Clifford v. State, supra*, Mr. Justice Orton inadvertently named manslaughter in the *third* degree, when he must have intended manslaughter in the second degree, under sec. 4351. The view we have taken of sec. 4351 is

Terrill vs. The State.

sustained by *Giskie v. State*, 71 Wis. 615, and *Doherty v. State*, 84 Wis. 152. The defendant was entitled to have the instruction he had asked under sec. 4351 given to the jury, without the qualification added by the court. This qualification was erroneous, and operated to deprive the defendant of the benefit of the section.

2. The court instructed the jury that if they were not convinced from the evidence, beyond a reasonable doubt, that the defendant was guilty of murder in the first degree, then their verdict must be not guilty, unless they found him guilty of manslaughter in the second degree, under the instruction given them at the request of the defendant's counsel; and the court refused to give the jury instructions specially requested under the statute in relation to manslaughter in the second, third, and fourth degrees, as defined in secs. 4350, 4351, 4354, 4362. The effect of the charge of the court made it necessary for the jury to acquit the defendant, or to convict him of murder in the first degree, or of manslaughter in the second degree, under the instruction asked on that subject by the defendant, and as modified by the court. All other grades or degrees of felonious homicide were withdrawn from the consideration of the jury. We consider that the view thus taken of the legal aspects of the case was too narrow and too much restricted, and that the evidence which we have stated at considerable length would, if believed by the jury, in different aspects, have sustained a verdict finding the defendant guilty of manslaughter in the second, third, or fourth degree, if the defense of justifiable homicide was not substantially made out.

We purposely refrain from commenting upon the evidence, or indicating more exactly what, in our estimation, it tends to prove, not desiring to embarrass a fair consideration of the merits on the second trial. It was the duty of the court to accurately give to the jury the law of whatever degree of felonious homicide the evidence tended to prove, and no

Terrill vs. The State.

other. 2 Bish. New Cr. Proc. § 638, and cases in note 4; *Bennett v. State*, 57 Wis. 81. In *Perkins v. State*, 78 Wis. 551, it was said that "The court should be very sure that the evidence could not justify some lower grade of crime before so instructing the jury. The third degree of manslaughter is 'the killing of another in the heat of passion, without a design to effect death, by a dangerous weapon.'" In the present case there was a fierce attack made by the deceased on the defendant, and a desperate struggle ensued, and, as said in *Perkins v. State, supra:* "How can the court say that there was no heat of passion, or that there was a design to effect death by the shooting? He may have designed to shoot, but not to kill,— that is not impossible. These were facts for the jury, not for the court, to find, or to find that they did not exist." What the jury could properly find as proved involved the credibility of witnesses, the consideration of all the facts and circumstances in evidence, and the inferences that might be fairly drawn from them, as well as the question of the defendant's intent, so far as material. In like manner it was for the jury to consider and determine, from the evidence, under appropriate instructions as to what would constitute such offense, whether the case made out was one of manslaughter in the fourth degree. Our conclusion upon the whole case is that in its proper legal aspects it was not correctly and properly submitted to the jury. For these reasons the judgment of the circuit court must be reversed, and a new trial awarded.

*By the Court.*— The judgment of the circuit court for Iowa county is reversed, and the case is remanded to that court for a new trial, and to that end it is ordered that the warden of the state prison, in whose custody the said accused, *Stephen Terrill*, now is, do deliver him into the custody of the sheriff of the county of Iowa, who is required to keep him in his custody until discharged therefrom according to law.

Terrill vs. The State.

MARSHALL, J.  I concur in the reversal of the judgment in this case, but dissent from the criticism made of the following language in the learned judge's charge to the jury: "I charge you that, if the defendant was not justified by the law of self-defense as heretofore given you in the instructions asked, and as I shall hereafter give it to you, in shooting and killing Quirk, and the killing of Quirk was, therefore, unnecessary and unlawful, and if you are convinced by the evidence beyond a reasonable doubt that when the defendant shot and killed Quirk he did so pursuant to an intent then distinctly formed in his mind to kill Quirk, you cannot lawfully find the defendant guilty of manslaughter in the second degree, for the defendant in such case, if he killed Quirk from premeditated design to kill him, is guilty of murder in the first degree." If there is any branch of the law where the doctrine of *stare decisis* should be more rigidly maintained than in any other, it is in respect to the criminal law, and particularly in regard to the law of criminal homicide. To carefully and effectually distinguish between the different degrees of felonious homicide is at best not free from difficulty, and certainly such difficulty should not be increased by new distinctions, having the effect to overrule or cast doubt upon the settled law as it has heretofore been understood in this state for a quarter of a century, and in New York, from whence our statutes prescribing the degrees of felonious homicide were adopted. Such, in my judgment, is the effect of the criticism which my brethren make of the charge referred to. Since the exhaustive discussion of this subject in the masterly opinion by RYAN, C. J., in *Hogan v. State*, 36 Wis. 226, the bench and bar of this state have understood that every homicide perpetrated pursuant to a previously formed intent to take human life, and not under such circumstances as to be justifiable or excusable, is murder in the first degree. Such was the decision of this court in that case, so distinctly made as to be unmistakable, and

Terrill vs. The State.

it has not since been departed from, so far as I am able to ascertain. "Previously formed intent to kill" and "premeditated design to kill" are synonymous terms. Says the learned chief justice: "We take the 'premeditated design' of our murder in the first degree to be simply an intent to kill. Design means intent, and both words essentially imply premeditation. The premeditation of the statute does not exclude sudden intent, and need not be slow, or last long. This very plainly appears, not only by the force of the words used, but also by the apparent use throughout the definitions of murder and manslaughter, of the terms, 'design' and 'premeditated design,' to effect death, as co-equal terms." To be sure, the learned chief justice speaks of the language of the second as well as of the first and third degrees of manslaughter, as containing the words "without design to effect death," when such words are not there. Such error probably came from the fact that he had before him the uniform construction given to the same statute by the courts of New York to the effect that design or intent to kill must be absent in the second as well as in the first and third degrees of manslaughter. But that the court decided in the *Hogan Case* that the terms "premeditated design to kill" and "previously formed intent to kill" mean one and the same thing, as applied to our statutory murder and manslaughter, is too clear to admit of any discussion whatever. In *Clifford v. State,* 58 Wis. 477, the following instruction was approved: "If you find from all the evidence in this case, beyond all reasonable doubt, that the defendant shot William R. Pugh, thereby causing his death, from a premeditated design to effect his death, then, no matter what the provocation was, or what the surrounding circumstances were, unless such shooting was justifiable, as explained in these instructions, he is guilty of murder in the first degree." To be sure, language is used by Mr. Justice ORTON in the same opinion to the effect that a mere intentional

killing is not equivalent to the premeditated design of the statute, but that it is not inconsistent at all with the decision in *Hogan v. State* to the effect that a homicide pursuant to an intention distinctly formed in the mind to kill does constitute such equivalent. I am not able to reason sufficiently close to see any distinction between the words, " If you are convinced by the evidence beyond a reasonable doubt that when the defendant shot and killed Quirk he did so pursuant to an intent then distinctly formed in his mind to kill Quirk, you cannot lawfully find the defendant guilty of manslaughter in the second degree, for the defendant in such case, if he killed Quirk from premeditated design to kill him, is guilty of murder in the first degree," and the words approved in *Clifford v. State.* " Premeditated design to kill," as used in the latter, instead of " intention previously distinctly formed in the mind," makes no difference. They mean the same. The intentional killing that may exist, consistent with manslaughter in the second degree, is the intent that springs from momentary impulse, and is implied from the mere act itself, as in *Doherty v. State,* 84 Wis. 152. Such must necessarily have been the design of the law, else a person in any case may deliberately kill another if such killing be done while such other is attempting to commit a felony, or after such attempt shall have failed, and be guilty only of manslaughter in the second degree. This is the first time, in my judgment, that such doctrine has been laid down by this court. The general doctrine is that, where the killing is intentional, that is, where there is a specific intent in the mind to kill which is effected by the act of the slayer pursuant to such intent, and the killing is not lawful, it is murder. 2 Bish. Cr. Law, § 695. In *People v. Lilley,* 43 Mich. 521, the subject of what constitutes the intent, which is the distinguishing characteristic between murder and manslaughter, was considered, and it was there said, in effect, that while manslaughter often involves intent to kill, it is

Terrill vs. The State.

not the deliberate intent which constitutes murder in the first degree.    When once it appears that the intent to take life existed, speaking, clearly, of intent distinctly formed in the mind, as the learned judge said in this case, and circumstances do not exist to render the killing lawful or excusable, the homicide is murder.

As said before, our statute was adopted from New York. It may be found in 2 R. S. N. Y. 1829, 661, § 11.    It had a well-recognized construction there before its adoption here, hence such adoption carried with it such construction.    The language of Mr. Justice EMMONS, in *People v. Austin,* 1 Parker, Cr. R. 166, states clearly such construction.    We quote from the opinion as follows: " Whether the act was murder or manslaughter under our statute depends entirely upon the existence of an intention to kill.  .  .  .    There is only one homicide known to our law which becomes murder in the absence of an intent to effect death, and that is when the act is perpetrated by one then engaged in the commission of a felony.    Except in that one case, no homicide is murder without an intention to kill, and with such an intention every homicide, with the single exception already mentioned, unless it be justifiable, is murder.  .  .  .    If a homicide be perpetrated without an intention to kill, it would be manslaughter and no more, except in the single case mentioned; but, if perpetrated with an intention to kill, no matter how recent the provocation or how high the passion, it is murder.    An act of homicide perpetrated with a premeditated design to effect death, though in the very highest flight of passion and springing even from an existing provocation, can find no resting place in our statute, except under the definition of murder or justifiable homicide, and, the intention to kill being established, there is no degree or description of manslaughter in the statute which can embrace it."    To the same effect are *People v. Sherry,* 2 Edm. Sel. Cas. 52; *People v. Pritchard,* 2 Edm. Sel. Cas. 219; and *People v. Beckwith,* 103 N. Y. 360.

The foregoing sufficiently shows the reasons for my dissent from the criticism made in the opinion of the court to that portion of the judge's charge here discussed. Thus recording such dissent, I leave the subject.