PERUGI, Plaintiff in error, vs. THE STATE, Defendant in error.

*September 13 — October 20, 1899.*

*Criminal law and practice: Murder: Self-defense: Instructions to jury:
Degrees: Cause of death: Premeditated design.*

1. On a prosecution for murder where it was claimed that the killing
   was done in self-defense, the disparity in size of the parties was
   important only in determining what an ordinarily prudent man in

the position of the accused would have done under all the circum-
stances; and where these considerations were fully submitted to
the jury it was not a prejudicial error to refuse an instruction that
"in the assault of a powerful man upon a weaker the necessity of
taking life in self-defense will be more easily discoverable than in
an attack by one man under equal circumstances."

2. A refusal to charge that the law does not require an assaulted party
to call upon bystanders before resisting an attack was not error,
where upon the evidence there was no necessity for such an in-
struction, and full instructions on the law of self-defense, covering
every phase of the testimony, were given.

3. The fact that just before the killing the deceased had "tried to
grab" the accused while they were at a table in a saloon did not
require the court to submit to the jury the question whether the
killing was manslaughter in the second degree (Stats. 1898, sec.
4351), where all the circumstances and the accused's own testimony
showed that the shooting was not done in resisting such assault.

4. Where the evidence fails to show that there was any "heat of pas-
sion," the court need not submit the question whether the killing
was manslaughter in the third or fourth degree.

5. Where the evidence was undisputed that defendant shot the de-
ceased, the bullet lodging in the spinal column and injuring it to
such an extent that the wound was necessarily fatal, it was not
error for the court to state that it appeared beyond question that
defendant inflicted upon the deceased "a dangerous wound, from
which death ensued eleven days thereafter," although the imme-
diate cause of death was the shock resulting from an operation
which was deemed advisable by the attending surgeons.

6. Every homicide, not justifiable or excusable, perpetrated in pursu-
ance of a previous intention to kill distinctly formed in the slayer's
mind, is murder in the first degree, even though the killing fol-
lows instantly the formation of such intention. *Terrill v. State*,
95 Wis. 276, and *Sullivan v. State*, 100 Wis. 283, so far as they con-
flict with this doctrine, overruled.

ERROR to review a judgment of the municipal court of the
city and county of Milwaukee: EMIL WALLBER, Judge. *Af-
firmed.*

For the plaintiff in error there was a brief by *Carroll &
Carroll*, and oral argument by *W. J. Carroll*.

For the defendant in error there was a brief by the *At-
torney General*, and a separate brief by *A. C. Brazee*, district

attorney, and *A. C. Umbreit*, assistant district attorney, and the cause was argued orally by *Mr. Umbreit* and *Mr. E. N. Warner*, law examiner.

BARDEEN, J.    The plaintiff in error was convicted of murder in the first degree, and sent to state prison for life.    He now seeks to have such conviction reviewed by this court on the ground of certain alleged errors in refusing to instruct, and in misdirection of, the jury.

1. The principal ground of defense was that the killing was done in self-defense.    Counsel for the accused asked the court to instruct the jury as follows: "You are instructed that the law is that in the assault of a powerful man upon a weaker the necessity of taking life in self-defense will be more easily discoverable than in an attack by one man under equal circumstances, and the probable ability to defend without fatal recourse must depend upon the means and power of defense in the assaulted person."    This request was refused. . The propriety of such an instruction must depend upon the character of the assault and the attendant circumstances.    A homicide is justifiable, under the statute, when committed in the lawful defense of the person of the slayer, "when there shall be reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and there shall be reasonable cause for believing that there is imminent danger of such design being accomplished."    This instruction assumes that an assault had been made,— a question that will be treated in another branch of this opinion.    But, admitting that an assault had been made by deceased, the question of disparity in size of the parties did not justify a killing unless both conditions of the statute are met by the surrounding circumstances.    The comparative size of the parties is only important in determining what an ordinarily prudent man would have done in the position of the accused, hearing what he had heard, seeing what he

saw, knowing what he knew, and standing where he stood. All of these considerations were submitted to the jury in the general charge, and we are unable to see how the defendant could have been prejudiced by the refusal to submit this instruction.

2. Another error is said to have resulted in the refusal of the court to charge the jury that the law does not require an assaulted party to call upon bystanders before resisting an attack. The evidence fails to disclose any necessity for such an instruction. The court gave full and complete instructions on the law of self-defense, covering every phase of the testimony, and as favorable to defendant as due regard for the law and the facts would warrant.

3. The court submitted to the jury the question of defendant's guilt of murder in the first and second degrees, and refused to submit either the second, third, or fourth degrees of manslaughter, as requested by the accused.

Manslaughter in the second degree is where one unnecessarily kills another while resisting an attempt by such other person to commit any felony, or do any other unlawful act, or after such attempt has failed. Stats. 1898, sec. 4351.

The very essence of this degree of homicide is that the killing should be *unnecessarily* done, and done while resisting an attempt to commit a felony, or while resisting an attempt to do any other unlawful act, or after such attempt shall have failed. There is no pretense in this case that the deceased was killed while attempting to commit a felony. It is insisted, however, that such killing was done while accused was resisting an assault made upon him by deceased. In this view of the case, we have read the testimony with the most careful scrutiny. The fracas occurred in a saloon. The parties had been singing, eating, and drinking together for several hours. They were partially intoxicated. Mrs. Martino, the wife of the saloon keeper, was present, and her attention was directly attracted to the parties. Other witnesses were also present, and saw and heard all that oc-

curred. Not one of them, even under a close and sharp cross-examination, would testify that any assault was made by deceased. All the evidence upon which the claim of an assault is based came from the accused. On direct examination he testified as follows: "Dencie said: 'No, you cannot be like me. I am better than you every time and every way. I am a Sicilian. I am from the hot kind — what you call it — hot kind. I am better than you any way.' *And he got up, and he try to make a grab on me.* He had his coat on his hand, standing in this way [indicating]. I was the other side of the table. *He got up and tried to grab me.* He told me: 'Yes, I am better than you every way. If you have anything to say, come outside. I kick your head off.' When I see he tried to grab me, I skipped behind Mrs. Martino. I said, 'Do you mean that?' and he said 'Yes,' and struck his hand on the table, and on the impulse of the moment I pulled the gun and shot him. . . . I had no ill feeling towards him. I shot him because he tell me he kick my head off. He was big enough to kick me. Once he told me I don't get a chance, and I was afraid he was going to kill me, because he told me once." On cross-examination he says that Dencie made some slurring remarks about the Catholic church, and cursed the Madonna, and that when he said that he pulled his revolver and shot him.

Looking at the evidence as a whole, and considering it in the light most favorable to the accused, we are unable to discover anything in it that would warrant the court in submitting this degree of homicide to the jury. Admitting that the deceased "made a grab" at him while they were at the table, all of the circumstances and the accused's own testimony show that the shooting was not done in resisting such assault. As stated in *Fertig v. State*, 100 Wis. 301: "It is only where there is evidence tending to establish a particular offense of criminal homicide that the trial court is required to instruct the jury in regard to it."

Manslaughter in the third degree is where one kills an-

other in the *heat of passion*, without design to effect death, by a dangerous weapon. Stats. 1898, sec. 4354. A full and complete answer to the contention that this degree of homicide should have been submitted to the jury is found in the testimony of the accused. He says: "I was not mad or angry at him at all. That night I was not mad at him. I had no hard feeling towards him, and not angry in the least bit. *I knew what I was doing.*" The evidence failing to show the element of heat of passion, there was no foundation upon which to base a submission of this degree of homicide to the jury.

The same element is necessary in manslaughter in the fourth degree, and the court was fully warranted in refusing to submit it.

4. In making a statement of the facts in the case, the court made use of the following language: "It appears beyond question that on the 15th day of April, 1898, in the saloon of John Martino, located at 137 Huron street in this city, the defendant discharged a loaded revolver at Peter Dencie, inflicting upon said Dencie a dangerous wound, from which death ensued eleven days thereafter." This is said to have been error, because "the point whether such wound was dangerous, and whether death resulted eleven days thereafter from such wound, was a disputed and strongly contested question of fact" on the trial. That question may have been strongly contested, but the evidence in regard to it was all one way. Dr. Sifton, the surgeon in charge, and the one who conducted the post-mortem examination, described the wound and his treatment of it. An X-ray examination was made, and the bullet was found to have lodged in the spinal column, at the fourth dorsal vertebra. The conditions were such that an operation was deemed advisable. The doctor testified: "The immediate cause of his death was the shock resulting after the operation. The cause of that shock, and for which the operation was done,

was the gunshot injury, which would have necessarily been fatal. I found the spinal cord injured; certain columns degenerated; gross lesions of the cord could be seen. . . . From my experience as a physician, and knowledge, the man could not recover, as the wound was fatal." No physician disputed the existence of the conditions found by Dr. Sifton, and all admit that, if such conditions existed, the wound was necessarily fatal. The court was amply justified in making the statement quoted. See *Sharp v. State,* 51 Ark. 149.

5. We now come to a branch of the case that has given us considerable trouble. The court gave the following instructions to the jury, which were duly excepted to: "To constitute a murder in the first degree, the killing must have been done wilfully, deliberately, and with premeditation; that is, intentionally, sanely, and with prior deliberation, and without legal excuse or justification. 'Wilfully,' as used in the information and these instructions, means intentionally; that is, not accidentally. 'Deliberately' means an intent to kill, executed by the slayer in a cool state of the blood, in furtherance of a former design, to gratify a feeling of revenge or accomplish some other unlawful purpose, and not under the influence of a violent passion, aroused by real or supposed grievance, amounting to a temporary dethronement of reason. 'Premeditated design to kill' means a previously formed intention to kill. But while the law requires, in order to constitute murder in the first degree, that the killing should be wilful, deliberate, and premeditated, still it does not require that the wilful intent, premeditation, or deliberation shall exist for any particular length of time before the crime is committed. It is not necessary that the killing should have been considered, brooded over, or reflected upon for a week, a day, or an hour. It is sufficient if there was a design and a determination to kill, distinctly formed in the slayer's mind at any moment before

or at the time the shot was fired which caused the death of the person killed. There may be no appreciable space of time between the intent to kill and the act of killing, and if sufficient deliberation was had to form a design or purpose to take life, and to put that design or purpose into execution by destroying life, then, there was, in law, sufficient deliberation to constitute murder in the first degree, no matter whether the design to take life had been for a long time contemplated by the slayer, or whether the design to kill was formed by him at the instant of the fatal shot. It is enough that the intention to kill preceded the fatal act although the act followed instantly."

These instructions are attacked as laying down a rule wholly at variance with the decision of this court in the recent case of *Terrill v. State*, 95 Wis. 276, followed in *Sullivan v. State*, 100 Wis. 283. The importance of this contention has induced us not only to review the two cases mentioned, but many former decisions of this court bearing thereon, as well as decisions of courts in other states with similar statutes. It is asserted that the decision in the *Terrill Case* was a surprise to many of the lawyers and judges of the state versed in criminal law. It was said to be a complete departure from the rule which had prevailed in this state for many years, and introduced into the administration of criminal justice difficulties not theretofore existing. In view of this situation, we have thought it the part of wisdom to again consider the grounds upon which it rests, and, if a mistake has been made, rectify it, and thus save future confusion and uncertainty. In the *Terrill Case* the court charged the jury that if, when the defendant shot deceased, " he did so pursuant to an *intent then distinctly formed* in his mind to kill," they could not find him guilty of manslaughter in the second degree, " for the defendant, in such case, if he killed Quirk from *premeditated design* to kill him, is guilty of murder in the first degree." This was given in qualification of an instruction submitting defendant's guilt

of manslaughter in the second degree. The vice of this in-
struction is said to have consisted in the fact that it " wholly
failed to distinguish between the intentional and unneces-
.sary killing under the circumstances stated in sec. 4351 and
a killing when perpetrated by premeditated design to effect
the death of the person killed, which last is murder in the
first degree." The result of the discussion which followed
in the decision was that there might, under our statutes, be
a *distinct* intent to kill under circumstances rendering the
slayer guilty of felonious homicide, without the element of
*premeditated design*, essential to murder in the first degree.
The case principally relied upon to support this conclusion
is *State v. Fee*, 19 Wis. 562, which was a case in which the
validity of an indictment for assault with "intent to mur-
der " was under consideration. The charge was laid in the
language of the statute, and the court held that, inasmuch
as the words " of his malice aforethought " were necessary
in indictments for murder, an indictment for assault "with
intent to murder " was bad without them. In the opinion
it was also said: " In opposition to this view it is said that
the words 'intent to kill or murder' excluded the idea of
manslaughter, which is a killing without a design to effect
death. But under our statutes (secs. 13, 21, ch. 164, R. S.) it
is clear a person may *intentionally* take the life of another·
and be guilty of manslaughter, and that only." The stat-
utes referred to are substantially the same as secs. 4351,
4363, Stats. 1898. The indictment was held good under an-
other section of the statute, which provides a penalty for an
assault with intent to commit manslaughter. In the subse-
quent case of *Kilkelly v. State*, 43 Wis. 604, this court aban-
doned the view held in the *Fee Case*, and held an indictment
good that described the offense in the language used in. the·
latter case, basing it upon the change made in the criminal
laws of the state by ch. 137, Laws of 1871. See *Cross v.*
*State*, 55 Wis. 261.

So far as we are able to discover, that portion of the decision in the *Fee Case* which says that there might be an intentional killing, and the slayer only be guilty of manslaughter, was never brought to the attention of the court until the *Terrill Case* came up for consideration. In the meantime many cases of criminal homicide were brought to this court, in which the sufficiency of indictments and informations was considered, and where instructions given to juries were passed upon. In *Hogan v. State*, 36 Wis. 226, Chief Justice RYAN made a most careful and thoughtful review of our statutes relating to homicides, and laid down certain propositions which stood unchallenged for nearly a quarter of a century. Prior to its rendition, no decision had been made which attempted to cover the same ground. His elucidation of the law of murder in the first degree, and of the scope and meaning of the words used in the statute, has entered into and been adopted as the basis of hundreds of instructions to juries since that time. He stated that it was the policy of the statute to put all statutory murder with actual intent to kill in one degree by itself, and all statutory murders with constructive intent to kill in the lower degrees of crime. What was said in this case was clearly opposed to the expressions noted in the *Fee Case*, and made the facts clear that under our statutes all wilful homicides committed by a person with a design to kill — that is, with a purpose that was premeditated and distinctly formed — were murder in the first degree. Both the *Terrill* and *Sullivan Cases* are opposed to this doctrine, and there is some ground for the claim that they bring into the administration of criminal justice much confusion and many difficulties, best appreciated by those who preside in the trial courts. The fact is undoubted that since the decision in the *Hogan Case* the bench and bar of the state have understood that every homicide perpetrated pursuant to a previously formed intent to take human life, and not under

Perugi vs. The State.

such circumstances as to be justifiable or excusable, was murder in the first degree. In the case of *Roman v. State*, 41 Wis. 312, the court charged the jury as follows, and this court sustained the instruction: "The first inquiry, then, for you is, Was there in the mind of the defendant, at the time Magill was killed, a premeditated design to produce death? No matter what the provocation, no matter what the heat of passion, no matter what the other surroundings may be, unless the act was justifiable, if there was a premeditated design to produce death, it is murder in the first degree." A very similar instruction was approved in the case of *Clifford v. State*, 58 Wis. 477. No doubt there are other cases in this court to the same effect.

The general doctrine seems to prevail everywhere that when the specific intent to kill exists, previously formed, distinct, and settled in the mind, any killing done pursuant thereto is murder. 2 Bish. Cr. Law, § 695. The case of *People v. Lilley*, 43 Mich. 521, is instructive on this point, and directly in line with the cases cited in this state. It says, in effect, that there can be no specific intent without deliberation, and that an act done on a sudden impulse — like manslaughter — cannot be deliberate; that, while manslaughter often involves an intent to kill, the true rule is that reason should, at the time of the act, be disturbed or obscured by passion to an extent which might render ordinary men, of average disposition, liable to act rashly, or without due deliberation or reflection, and from passion rather than judgment; and that to reduce the act to manslaughter it must be done while reason is obscured by passion, so that the party acts rashly and without reflection. In New York, where the statutes are similar to ours, the rule is carried farther, and it is said that a homicide may only be classed as manslaughter when there is no design to kill, and that when the purpose to kill is present it is murder in one of its degrees. *People v. Beckwith*, 103 N. Y. 360. As early as 1847

the courts of that state asserted the rule that the *intention* to take life constituted, under their statutes, the main distinction between murder and manslaughter; that, except in the one case when the homicide was committed by one engaged in committing a felony, no homicide was murder without an intention to kill; and with that intention, with the single exception mentioned, unless it be justifiable, it is murder, whether the intention is formed on the instant or had long been entertained. - *People v. Austin*, 1 Parker, Cr. R. 154. In another and later case it is said: "If there be sufficient deliberation to form a design to take life, and to put the design into execution by destroying life, there is sufficient deliberation to constitute murder, no matter whether the design be formed at the instant of striking the fatal blow or whether it be contemplated for months." The ultimate conclusion was that, if the intention to take life existed, it was murder. *People v. Clark*, 7 N. Y. 385. A similar proposition is approved in *People v. Hawkins*, 109 N. Y. 408.

We cannot resist the conclusion that every killing, not justifiable, done with that degree of deliberation and with an intent or design sufficiently fixed and settled in the mind as to come within the rule of "premeditated design" laid down in the statute and interpreted by the decisions of this court, is murder in the first degree; and any expression in the *Terrill Case* or the *Sullivan Case* to the contrary ought not to be adhered to. The intentional killing that may exist consistent with manslaughter in the second degree is the intent which springs from momentary impulse, when the mind is unbalanced, and there is no opportunity for consideration or deliberation.

Another difficulty with the *Terrill Case* is that this court seems to have failed to appreciate the force, scope, and effect of the language used by the trial judge. The instruction was: "If you are convinced by the evidence, beyond a reasonable doubt, that when he shot and killed Quirk he

Perugi vs. The State.

did so pursuant to an *intent, then distinctly formed in his mind*, to kill Quirk, you cannot lawfully find the defendant guilty of manslaughter in the second degree, for the defendant in such case, if he killed Quirk from *premeditated design* to kill him, is guilty of murder in the first degree." In the *Hogan Case* (36 Wis. 226) it was said that, "'Previously formed intent to kill' and 'premeditated design to effect death' are synonymous terms." And again: "We take the 'premeditated design' of our murder in the first degree to be simply an intent to kill. Design means intent, and both words essentially imply premeditation." Very similar expressions have been used in other jurisdictions. Intent means "that which is intended; purpose; aim; design; intention." Cent. Dict. The word "distinctly" is used as synonymous with clearly, explicitly, definitely, precisely, unmistakably. So, when the trial judge used the words, "intent then distinctly formed in his mind," and followed it with the words "premeditated design," is there any possibility that the jury could have mistaken his meaning? "Premeditate is to think of in advance; to determine upon beforehand; to intend; to design." And. Law Dict. The jury are presumed to know the usual and ordinary meaning of words, and, in view of the definitions given, there seems no escape from the conclusion that they understood the words "intent distinctly formed" to be the equivalent of "premeditated design."

It is but proper to say that Mr. Justice MARSHALL filed dissenting opinions in both the *Terrill* and *Sullivan Cases*, and that the views we have adopted are in harmony with the principles therein advocated by him.

What we have already said disposes of the objections raised to the portion of the charge first above quoted. The other criticisms to the charge are based upon the fact that the judge told the jury that the premeditated design need not have existed for any particular length of time, but it was sufficient if there was a design and determination to kill

distinctly formed in the slayer's mind at any moment before the fatal shot was fired. There are many cases in the books where this question has been considered. Thus, in *Aszman v. State*, 8 L. R. A. 33, 123 Ind. 347, it is said: "When a homicide has been preceded by a concurrence of will with an intention to kill, and these are followed by a deliberate thought or premeditation, although they follow as instantaneously as successive thoughts can follow each other, the premeditator may be guilty of murder in the first degree." In *Killins v. State*, 28 Fla. 313, the court below charged the jury that " 'premeditation' is defined as meaning intent before the act, but not necessarily existing any extended time before the act," and no fault was found with it in the appellate court. In Missouri "premeditated" is defined as "thought of beforehand for any length of time, however short." *State v. Harris*, 76 Mo. 361. We take the following from the syllabus to *Keenan v. Comm.* 44 Pa. St. 55: "The true criterion of the first degree in murder is the intent to take life. The deliberation and premeditation required by the statute is not upon the *intent*, but upon the *killing*. It is deliberation and premeditation enough to *form* the intent to kill, and not *upon* the intent after it has been formed. An intent distinctly formed even 'for a moment' before it is carried into act is enough." Quoting from *McDaniel v. Comm.* 77 Va. 281, we have the following: "The killing must be a predetermined killing upon consideration, and not a sudden killing upon the momentary excitement and impulse of passion; . . . and this design to kill need not have existed for any particular length of time. It may be formed at the moment of the commission of the act." In *Hawthorne v. State*, 58 Miss. 778, it is said that the "deliberate design" to effect death of their statute could be formed suddenly, and that the use of a deadly weapon to kill was presumptive evidence of such design. A recent case in Alabama contains the following discussion of the subject: " 'Deliberate' and

',premeditated,' as those words are used in the statute, mean only this: That the slayer must intend, before the blow is delivered, though it be but an instant of time before, that he will strike at the time he does strike, and that death will be the result of the blow; or, in other words, if the slayer had any time to think before the act, however short such time may have been,— even a single moment,— and did think, and he struck the blow as the result of an intention to kill by this momentary operation of the mind, and death ensued, that would be a deliberate and premeditated killing, within the meaning of the statute defining murder in the first degree." *Daughdrill v. State*, 113 Ala. 7. In New York the rule is thus stated in *People v. Clark*, 7 N. Y. 393: "If there be sufficient deliberation to form a design to take life, and to put that design into execution by destroying life, there is sufficient deliberation to constitute murder, no matter whether the design is formed at the instant of striking the fatal blow or whether it be contemplated for months. It is enough that the intention precede the act, although that follows immediately." Judge DANFORTH, in *Leighton v. People*, 88 N. Y. 117, says: "If the killing is not the instant effect of impulse, if there is hesitation or doubt to overcome, choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder." Although apparently not intending to modify the rule, Judge EARL makes use of the following language in *People v. Majone*, 91 N. Y. 211: "Under the statute there must not be only an intention to kill, but there must also be a deliberate and premeditated design to kill. Such design must precede the killing by some appreciable space of time. But the time need not be long. It must be sufficient for some reflection or consideration upon the matter, for choice to kill or not to kill, and for the formation of a definite purpose to kill. The human mind acts with celerity, which it

is sometimes impossible to measure; and whether a deliberate or premeditated design to kill was formed must be determined from all the circumstances of the case." Later cases on the same subject may be found cited in *People v. Constantino*, 153 N. Y. 24, and *People v. Decker*, 157 N. Y. 186. It will be noted that in the cases last above cited the statement is made that the "design must precede the killing by some appreciable space of time." Yet from the language that follows it is evident that it all depends upon the particular circumstances of the affray, and that, if there was time for the slayer to settle and fix upon a design or purpose to kill,— that is, for a choice to kill or not to kill,— the requirements of the statute have been met, although the formation of the design and the act follow instantaneously.

The case of *Hogan v. State*, before cited, and *Clifford v. State*, 58 Wis. 477, are closely in line with the authorities mentioned, and very many of the expressions excepted to in the judge's charge may be found in one or the other of these cases. What is there said fully meets the objections urged here, and it is not necessary to repeat it. The conclusions here reached are the result of a careful study of the facts in this case and of the law applicable thereto. The case seems to have been tried with due regard to the rights of the accused, the evidence is quite sufficient to warrant the conclusion arrived at by the jury, and the principles of law governing the case justly applied.

*By the Court.*— The judgment of the municipal court of Milwaukee county is affirmed.