DIERICKX v. DAVIS, AGENT.

[No. 11,312. Filed December 22, 1922. Rehearing denied April
April 5, 1923. Transfer denied June 5, 1923.]

1. CARRIERS.—Contract to Transport Circus.—Release from Liabilities for Negligence.—Validity.—A contract for hauling a circus train from place to place on a schedule suitable to the show company's own peculiar purpose, wherein the railroad company was released from liabilities for negligence of the carrier's employes, is valid. p. 81.

2. CARRIERS.—Contract to Transport Circus.—Common Carrier. —In the performance of a contract to haul a circus train from place to place on a schedule suitable to a show company's own peculiar purpose, the railroad company was not acting as a common carrier. p. 82.

3. CARRIERS.—*Contract to Transport Circus.—Negligence.—Release from Liabilities.—Validity.*—A contract for hauling a circus train from place to place on a schedule suitable to the show company's own peculiar purpose, relieving the railroad from liabilities for negligence of the carrier's employes, is not violative of the Hepburn Act (34 Stat. at L. 584) and Carmack Amendment (§§8604, 8604aa U. S. Comp. Stat. 1918). p. 82.

4. CARRIERS.—*Contract for Transportation of Circus.—Negligence.—Liability to Employes of Circus.*—A railroad company, although distinctively a common carrier when engaged in the performance of its legal duties, nevertheless, when acting in matters not within the scope of its legal duties, may contract as a private carrier and lawfully provide that it shall not be liable for injury to persons and property caused by its negligence, and an employe of a show company, accepting transportation on a railroad under a contract as a private carrier, is bound by its terms, and cannot recover on the theory of negligence. p. 83.

5. CARRIERS.—*Contract to Transport Circus Train.—Released from Liabilities.— Construction.— Negligence.*— All contracts limiting the liability of a common carrier must be strictly construed against the carrier, a provision in a contract of a railroad company to haul a circus train that it shall not be liable for injury "arising from any cause whatever" intended to grant immunity from liability on account of negligence only, and not immunity from liability for injury wilfully and intentionally inflicted. p. 83.

6. NEGLIGENCE.—*Willful Tort.*—There is a distinction between a negligent tort and a willful tort, and negligence cannot merge into willfulness. p. 84.

7. PLEADING.—*Theory of Action.—More than One Theory in Same Paragraph.*—The theories of negligence and willfulness cannot legitimately be pleaded in the same paragraph of complaint. p. 85.

8. PLEADING.—*Theory of Action.*—The character of a pleading must be determined from its general scope and not from the epithets cast into it. p. 85.

9. CARRIERS.—*Injuries to Circus Employe.—Theory of Action.— Willful Negligence.*—In an action against a railroad company by a circus employe for injuries sustained in a collision while being transported on a circus train, a paragraph of the complaint alleging that the defendant "willfully, deliberately and intentionally. * * * set in motion and propelled forward the * * * special train at a high rate of speed without keeping or maintaining any lookout for such warning signals"

Dierickx v. Davis, Agent—80 Ind. App. 71.

and notwithstanding the danger signals "deliberately and willfully drove and propelled said special train into the rear of the above-named circus train," *held* the theory is willful negligence. p. 85.

10. TORTS.—*"Willfulness."*—In the law of torts the meaning of "willfulness" is to do a tortious act willfully, intentionally, purposely, designedly and no one can inflict a willful injury without being guilty of conduct which is either criminal or *quasi* criminal. p. 86.

11. CARRIERS.—*Injuries to Circus Employe.—Evidence.—Willful Negligence.—Sufficiency.*—In an action against a railroad company by a circus employe for injuries sustained in a collision while being transported on a circus train, *held*, that there was no evidence to show that the collision was caused by the willful negligence of the railroad company's employes. p. 86.

12. CARRIERS.—*Personal Injuries.—Action.—Law Governing.*—A common-law action arising out of tort for personal injuries instituted in the courts of this state by a circus employe, who was injured when the show train on which he was riding was wrecked, is governed by the laws of this state, and not the federal law, there being no federal statute involved, and it is immaterial whether plaintiff at the time of his injury was on an interstate or intrastate journey. p. 88.

From Lake Superior Court; *Walter T. Hardy*, Judge.

Action by Joe F. Dierickx against Walker D. Hines, Director General of Railroads (for whom John C. Davis, Agent, was substituted) and the Michigan Central Railway Company. From a judgment for named defendant, the plaintiff appeals. *Affirmed.*

*David K. Tone, Frank A. Rockhold, Walter Myers* and *Fred Barnett*, for appellant.

*Winston, Strawn & Shaw, Ibach, Gavit, Stinson & Gavit, Frank E. Robson* and *J. Walter Dohany*, for appellee.

This action was instituted by the appellant against the appellee Walker D. Hines, Director General of Railroads, and the Michigan Central Railway Company, to recover damages for personal injuries. The appellant was an employe of the Carl Hagenbeck and Great Wallace Show Company, and at the time he received his

injuries he was riding on the circus train. The circus train stopped on the track near Gary, Indiana, and another train, known as a "troop train," ran into the circus train, causing a rear-end collision. This litigation arises out of that incident.

The amended complaint on which the cause went to trial consisted of three paragraphs. The theory of liability on which the first paragraph rests must be determined from the following averments therein contained:

"That a switchman, being an employe of the said defendants on the train on which plaintiff was riding, caused the track on which said circus train stood to be protected by fuses and signal lights; yet the said defendants, through their servants, not regarding their duty in that behalf, then and there did so willfully, wantonly, recklessly, and negligently run and propel another train  *   *   *  over the said track and behind the train on which the plaintiff was riding, without notice or warning, and without giving any heed to or paying any attention to said fuses and said lights, and to the warning of the block signal system in use on said track, or the train on which the plaintiff was then and there riding, so that said last mentioned train ran into, crashed into, hit, and struck the train on which the plaintiff was riding, demolished many of the cars on said train, including the car on which the plaintiff was riding, and then and there wrecking and demolishing the car on which the plaintiff was riding; that said wreckage of said car and said collision then and there inflicted upon the plaintiff the following injuries: that by reason of said concussion and on account of being hit by portions of said car when the same was demolished by reason of the defendant's negligence, the plaintiff's eye was seriously and permanently injured in this  *   *   *,  that since the plaintiff was injured through the negligence of the defendants, as hereinbefore al-

leged, he has been and will hereafter be permanently disabled * * *. And the plaintiff further avers that said accident was not caused or brought about by any negligence or want of care on his part, but the same was caused wholly by the willful, wanton, reckless, and negligent conduct of the servants of the defendant as above set forth."

In the second paragraph the theory of liability is averred in the identical language of the first.

The third paragraph sets forth the theory of liability in the following language: "That the plaintiff at all times hereinafter mentioned was in the exercise of due care and diligence for his own safety; that it thereupon became and was the duty of the defendant with respect to the plaintiff to operate both of said trains of cars and to transport the same with due care and caution and to maintain a lookout for cautionary and danger signals which might be given by the automatic block system then installed on said road between the points above mentioned, so as not to injure the plaintiff, but the plaintiff avers that the defendants nevertheless did not operate or transport such trains of cars with care and caution or maintain a lookout for such signals or for any other purpose, but willfully, deliberately and intentionally, and willfully and intentionally disregarding their duty in that behalf, respecting the said plaintiff, set in motion and propelled forward the above mentioned special train at a high rate of speed without keeping and maintaining any lookout for such warning signals, or for the purpose of securing the safety of such trains of cars as might be upon the track, and in particular of said circus train and the persons thereon.

"That the plaintiff then and there through its employes stopped the said circus train upon its tracks at or near the Ivanhoe Tower near Gary, Lake county, Indiana; that cautionary and danger signals were at such

time set by and under said automatic block system at such a distance in the rear of such circus train as to be clearly observable to any lookout on said special train at a distance sufficient to stop such special train without colliding with such circus train and that divers other danger signals were displayed and were clearly visible to a lookout on said special train, but that the defendants notwithstanding such opportunity to observe such signals and so bring said special train to a stop, deliberately and willfully drove and propelled said special train into the rear of the above named circus train so that the said circus train was wrecked, destroyed and burned; and then and there killed many persons on said train, then and there wrecking and demolishing the car on which the plaintiff was riding; that said wreckage of said car and said collision then and there inflicted upon the plaintiff the following injuries."

An answer was filed by each defendant, and thereafter the action was dismissed as to the railroad company. The cause proceeded to trial, and at the conclusion of the plaintiff's evidence the court directed a verdict for the defendant.

Insofar as necessary to an understanding of the question to be decided the plaintiff's evidence is as follows:

The Michigan Central Railway Company is the owner of a railroad extending from Toledo, Ohio, to Hammond, Indiana, through the southern portion of the State of Michigan. The Director General of Railroads was in possession of, and operated and controlled, the railroad on June 22, 1918. The plaintiff was an employe of the Carl Hagenbeck and Great Wallace Show Company, as a performer. The show company owned flat cars, stock cars, box cars, coaches, advertising cars, animals, vehicles and circus paraphernalia. The show company had also certain agents and employes to be carried from place to place, some of them on the circus train, others

on regular trains.    The circus train consisted of a total of forty-nine cars.

The show company entered into an agreement with the railway company, in writing, concerning the movement of the circus train and the transportation of certain of its agents and employes on regular trains. Thereupon the railway company filed the agreement with the Interstate Commerce Commission together with a document which it denominated a tariff. The "tariff" and the agreement were introduced in evidence as one exhibit. The "tariff" is merely explanatory of the contract.

It is unnecessary to set out the agreement in full. Among other things, it stipulates that the railway company will furnish the use of its railroad and necessary side tracks, the necessary conductors, engineers and other trainmen, and sufficient motive power to perform the switching and placing of cars for loading and unloading at its stations therein named, and to move the show train on the dates and from place to place as therein specified; that the railway company shall receive the empty equipment of the show company from a connecting line at Toledo, Ohio, on the morning of June 13, 1918, and shall move the train about midnight of that day, after exhibition at Toledo, for Detroit, Michigan, and thereafter the train was to be moved after each successive exhibition to the next place of exhibition; that, when the train shall have finally arrived at Franklin Park, Illinois, it shall be delivered to the C. M. and St. Paul Railway Company; that the railway company shall haul the advertising cars and necessary employes therein on such of its regular trains as may be most convenient to the railway company; that in consideration of the use of the road, motive power, servants and facilities, and the transportation of the advertising cars and employes therein on regular trains,

the show company shall pay $2,420.68. The contract also contains the following:

"It is agreed that this contract is not made with the railroad company as a carrier, either common or special, of the said persons or property or any thereof * * * but as a hirer to the party of the second part of the motive power and of men to operate the same, and of the right to use the road and tracks of the said railroad company, to the extent necessary in the premises; and that the conductors, engineers, trainmen and other employes furnished by the railroad company hereunder shall, as between the parties hereto, while engaged in such employment, be deemed to be the servants of the party of the second part; and that the railroad company shall not be liable to the party of the second part, nor to any person or persons, for any injury or damage which may happen to the persons, cars or property to be transported hereunder, which may be caused by defects in the railroad or tracks or by unsuitableness thereof for such transportation, or by the negligence of said conductors, engineers, trainmen or other servants, or any or either of them, or arising from any cause whatever."

Pursuant to the terms of the contract, the circus train was moved from place to place over the railway company's tracks. On June 21, 1918, the show company exhibited at Michigan City, Indiana, and after the evening performance the circus train started on its way to Hammond, Indiana and Franklin Park, Illinois. The plaintiff and other employes of the show company were riding on the train in the customary way. The plaintiff paid no fare. He occupied his place on the train solely by virtue of the foregoing agreement and his contract of employment hereinafter mentioned. When the train reached Ivanhoe, a place about four miles east of Hammond, in the early morning of June 22, a hot box was discovered about the middle of the train. The

train was stopped in order that attention might be given to the hot box. On the rear end of the caboose there were lights showing red to the rear and green to the front and side, and these lights were about eight feet from the ground. As the train was about to stop the conductor lit a fuse and put it out at the side of the caboose. The fuse was a red light and constituted a signal to stop. When the train stopped the brakeman took his flagging equipment and started to run back. The track was straight for three-quarters of a mile back, then there was a curve. The brakeman had a red fuse and a red and white lantern. He went back 600 or 800 feet. He met the troop train coming on the same track, the head light was burning, and the train was running at about twenty-five or thirty miles per hour. He lit his fuse and when the train passed him he threw the fuse at the engineer's cab or window. The window was closed. The train did not slacken its speed. The engine of the troop train ran into the circus train probably 150 feet. There was wreckage on the track, on the side of the track, and on the other track, and part of it caught fire. A mass of wreckage was around the engine. The troop train consisted of twenty-one standard sleepers. The conductor of the troop train was riding in the second car from the engine. He could have stopped the train without the assistance of the engineer, by pulling a cord. He saw no lighted fuse before the accident. There was in use a block signal system and there was a block signal post about one mile to the east of the rear end of the circus train. When the circus train passed that post, the light thereon was lighted and was showing red, signifying danger. The conductor of the troop train, riding in a Pullman car, could not see the block signal lights as the train passed, because they were too far above and too close to the track. It was no part of his duty to observe block sig-

nal lights. His duty was to stay in the car and watch the order boards. He felt the application of the air brakes just before the train stopped. The train moved probably five car-lengths after he felt that the air had been applied. The red fuse was not on the caboose of the circus train when the troop train approached—the conductor of the circus train had previously removed it. The lighted fuse which the brakeman threw at the engineer's window did not go into the cab. It was extinguished. The brakeman did not see anyone in the cab as the engine passed him. There was a sharp curve in the track about three-quarters of a mile in the rear of the circus train. The accident occurred at about 3:50 in the morning. The night was dark; the wind was cold, and was blowing at a high rate of speed.

It is conceded that the plaintiff and the show company entered into a certain contract, a copy of which was filed with and made a part of the answer, which contract fixed the terms of his employment. By the express provisions of that contract, and as one of the considerations for his salary, he released and discharged each and every railway company engaged in moving his employer's circus from all claims, demands, liabilities and causes of action for injury to his person or property while on its tracks or yards, or while occupying or being transported in the circus cars, in any manner, place or time, whether due to the fault or negligence of the railway company, its officers, agents or servants, or to the fault or negligence of his employers or their servants, acting separately or in combination; and gave to his employer the right to assign the contract to any such railway company to be used in its defense.

Dausman, J.—(After making the foregoing statement): The first contention of counsel for the appellant is that the contract between the railway company and the show company is void. Their reasoning is

that if the contract is void, then the ordinary relation of passenger and carrier existed between Dierickx and the railway company; and that, because of the relation thus existing, the railway company is liable to Dierickx for the damages resulting from the negligence which was the proximate cause of his injuries.

The contract between the railway company and the show company is not void on the principle of the common law, which, on the ground of public policy,

1. does not permit a common carrier to contract against liability for its own negligence. The service required by the show company in order that its itinery might be fulfilled, was special. If its engagements to give exhibitions at the various towns were to be punctually kept, its outfit must move on a time schedule peculiarly its own, and must move as an entirety. Its tents and trappings, its uncommon vehicles, its wild and domestic animals, and its numerous employes, must go together. For these and other reasons, it was impracticable, if not impossible, to use the railway company's equipment or its regular trains. It is apparent, and the important fact is, that the show company was not seeking transportation for persons and property in the usual course of the business of a common carrier by rail. It sought to have its own train of cars moved from place to place on a time schedule suitable to its own peculiar purpose. From the very nature of the service desired, and from the situation of the parties, it is clear that the property and employes of the show company were not to be entrusted to the railway company in the manner in which freight and passengers are entrusted to a common carrier. The railway company might have refused absolutely to receive or to haul the cars of the show company; for the railway company did not hold itself out as engaging in the business of haul-

ing or moving trains for others.    It follows, then, that the railway company had the right to enter into the contract with the show company on the conditions therein stated.    The contract is valid; and in the performance thereof, the railway company was not acting as a common carrier.    *Cleveland, etc., R. Co.* v. *Henry* (1908), 170 Ind. 94, 83 N. E. 710; *State* v. *Cadwallader* (1909), 172 Ind. 619, 87 N. E. 644, 89 N. E. 319; *Kelley* v. *Grand Trunk, etc., R. Co.* (1911), 46 Ind. App. 697, 93 N. E. 616; *Robertson* v. *Old Colony Railroad* (1892), 156 Mass. 525, 31 N. E. 650, 32 Am. St. 482; *Coup* v. *Wabash, etc., R. Co.* (1885), 56 Mich. 111, 22 N. W. 215, 56 Am. Rep. 374; *Mehegan* v. *Boyne City, etc., R. Co.* (1912), 178 Mich. 694, 141 N. W. 905, 148 N. W. 173, L. R. A. 1915E 1170; *Chicago, etc., R. Co.* v. *Wallace* (1895), 66 Fed. 506, 14 C. C. A. 257, 30 L. R. A. 161; *Chicago, etc., R. Co.* v. *Maucher* (1918), 248 U. S. 359, 39 Sup. Ct. 108, 63 L. Ed. 294; *Clough* v. *Grand Trunk Western R. Co.* (1907), 155 Fed. 81, 85 C. C. A. 1, 11 L. R. A. (N. S.) 446; *Wilson* v. *Atlantic Coast Line R. Co.* (1904), 129 Fed. 774.    The underlying principle is thoroughly discussed in *Baltimore & Ohio Southwestern Railway Co.* v. *Voigt* (1899), 176 U. S. 498, 20 Sup. Ct. 385, 44 L. Ed. 560; see note to *Louisville, etc., R. Co.* v. *Church* (1908), 130 Am. St. 29; and note to *Atchison, etc., R. Co.* v. *Homewood* (1912), 48 L. R. A. (N. S.) 990.

Counsel for the appellant insist, however, that the contract is in violation of certain acts of Congress, commonly known as the Hepburn Act (34 Stat. at L. 584) and the Carmack Amendment (§§8604a, 8604aa U. S. Comp. Stat. 1918) and they argue that the filing of the tariff is inconsistent with the claim that the service was rendered by the railway company otherwise than as a common carrier.    Whether the

document filed with the Interstate Commerce Commission is in any proper sense a tariff, and whether the statutes require the filing of a tariff in a case like this, are questions we need not decide. The purpose of a tariff is to prevent unreasonable discrimination. Had some other show company applied for like service, it might have had a legitimate interest in the tariff; but the appellant has no such interest. However, we find nothing in the statutes to which appellant has directed our attention, that prohibited the making of the contract.

The authorities are unanimous in holding that a railway company, although distinctively a common carrier when engaged in the performance of its legal duties, nevertheless, when acting in matters not within the scope of its legal duties, may contract as a private carrier and may lawfully provide in such a contract that it shall not be liable for injury to persons or property caused by its negligence. The appellant, an employe of the show company, having accepted transportation under the contract, is bound by its terms. Therefore, he cannot recover on the theory of negligence.

There is another phase of this case which must now be considered. It is an established rule of construction that all contracts limiting the liability of a common carrier must be strictly construed against the carrier. The spirit of that rule is applicable here. Accordingly we construe that part of the contract which stipulates that the railway company shall not be liable for injury "arising from any cause whatever" to mean injury due to negligence arising from any cause whatever. In other words, when all the provisions relating to nonliability are considered together they disclose that the show company intended thereby to grant, and the railway company intended thereby to acquire, immunity from liability on account of negli-

gence only; and that the parties did not contemplate immunity from liability for injury willfully and intentionally inflicted. If the parties had included the element of willful and intentional injury, to that extent the contract would have been void. The railway company, then, owed the duty to the appellant not to willfully injure him. He was not a trespasser; but even if he had been a trespasser on the track, nevertheless the railway company would have owed him that duty. *Cincinnati, etc., R. Co.* v. *Eaton, Admr.* (1876), 53 Ind. 307; *New York Central R. Co.* v. *Mohney* (1920), 252 U. S. 152, 40 Sup. Ct. 287, 64 L. Ed. 502, 9 A. L. R. 496.

In this jurisdiction there is a clear distinction between a negligent tort and a willful tort—between carelessness and willfulness. *Pennsylvania Co.* v. *Sinclair, Admr.* (1878), 62 Ind. 301, 30 Am. Rep. 185; *Indianapolis, etc., R. Co.* v. *McClaren, Admr.* (1877), 62 Ind. 566; *Terre Haute, etc., R. Co.* v. *Graham* (1883), 95 Ind. 286, 48 Am. Rep. 719; *Ivens* v. *Cincinnati, etc., R. Co.* (1885), 103 Ind. 27, 2 N. E. 134; *Chicago, etc., R. Co.* v. *Hedges, Admr.* (1885), 105 Ind. 398, 7 N. E. 801; *Louisville, etc., R. Co.* v. *Schmidt* (1886), 106 Ind. 73, 5 N. E. 684; *Louisville, etc., R. Co.* v. *Bryan* (1886), 107 Ind. 51, 7 N. E. 807; *Gregory, Admr.,* v. *Cleveland, etc., R. Co.* (1887), 112 Ind. 385, 14 N. E. 228; *Wabash, etc., R. Co.* v. *Locke, Admr.* (1887), 112 Ind. 404, 14 N. E. 391, 2 Am. St. 193; *Parker, Admr.,* v. *Pennsylvania Co.* (1893), 134 Ind. 673, 34 N. E. 504, 23 L. R. A. 552; *Cleveland, etc., R. Co.* v. *Miller, Admr.* (1898), 149 Ind. 490, 42 N. E. 445; *Brooks* v. *Pittsburgh, etc., R. Co.* (1902), 158 Ind. 62, 62 N. E. 694; *Dull* v. *Cleveland, etc., R. Co.* (1899), 21 Ind. App. 571, 52 N. E. 1013; *Southern R. Co.* v. *McNeeley* (1909), 44 Ind. App. 126, 88 N. E. 710; *Stauffer* v. *Schlegel* (1920), 74 Ind. App. 431, 129 N. E. 44; *Pittsburgh, etc., R. Co.* v. *Nichols, Admr.* (1922), 78

Ind. App. 361, 130 N. E. 546. See, also, *Pittsburgh, etc., R. Co.* v. *Ferrell* (1906), 39 Ind. App. 515, 78 N. E. 988, 80 N. E. 425. As evidenced by the foregoing cases, the hiatus between negligence and wilfulness is complete and absolute. There is no middle ground. Negligence cannot merge into willfulness.

There is an early case in seeming conflict with the cases last above cited. *Lafayette, etc., R. Co.* v. *Adams* (1866), 26 Ind. 76. But the language of the Adams case has been expressly disapproved. *Cincinnati, etc., R. Co.* v. *Eaton, Admr., supra; Terre Haute, etc., R. Co.* v. *Graham, supra.*

What is the theory of each paragraph of the amended complaint? That pleading is not skillfully drawn. In the first, and also in the second, paragraph the pleader attempts to combine negligence and willfulness. The two theories cannot legitimately be pleaded in the same paragraph. To an action on the theory of negligence, contributory negligence is a defense; but contributory negligence is not a defense to an action on the theory of willfulness. The character of a pleading must be determined from its general scope and not from the epithets cast into it. There is no escape from the conclusion that the theory of the first, as well as the second, paragraph of the amended complaint is negligence. *Louisville, etc., R. Co.* v. *Schmidt, supra; Stauffer* v. *Schlegel, supra.*

What is the theory of the third paragraph? If the averment of the plaintiff's freedom from negligence and the averment of the defendant's duty, be disregarded as mere surplusage, then it may be said that the theory of the third paragraph is willfulness. The averments of willfulness are that the defendant "willfully, deliberately and intentionally * * * set in motion and propelled forward the above mentioned special (troop) train at a high rate of speed

without keeping and maintaining any lookout for such warning signals;" and that, notwithstanding the danger signals, the defendant "deliberately and willfully drove and propelled said special train into the rear of the above-named circus train."

No paragraph of the complaint has been tested by demurrer, and we shall express no opinion as to the sufficiency thereof. We have considered the complaint for the sole reason that before the question arising on the evidence can be accurately and confidently determined, a clear conception of the theory of each paragraph is essential. To say that the complaint may be judged on one theory and the evidence on a different theory, would be to state an absurdity.

The question we have now to determine is whether there is any evidence in the record which tends fairly to support the theory of the third paragraph.

10, 11. Does the evidence adduced by the plaintiff tend fairly to prove the essential averments of that paragraph? Is there any proof of willfulness? In the law of torts "willfulness" has a well-established meaning. To do a tortious act willfully is to do it intentionally, purposely, designedly. No one can inflict a willful injury without being guilty of conduct which is either criminal or *quasi* criminal. *Louisville, etc., R. Co.* v. *Bryan, supra; Belt Railroad, etc., Co.* v. *Mann* (1886), 107 Ind. 89, 7 N. E. 893; *Brooks* v. *Pittsburgh, etc., R. Co.* (1902), 158 Ind. 62, 62 N. E. 694; *Pittsburgh, etc., R. Co.* v. *Ferrell, supra; Manlove* v. *Cleveland, etc., R. Co.* (1902), 29 Ind. App. 694, 65 N. E. 212. How may the intent of the wrongdoer be proved? Like most other facts, it may be proved by circumstantial evidence. In other words, willfulness may be inferred from the circumstances. But it will not do to say that willfulness may be inferred from negligence. Proof of negligent conduct, however flagrant, cannot be proof of will-

fulness; for, whenever negligence has been established, the very opposite of willfulness has been established. If, on the ground of expediency rather than truth, the courts should hold that willfulness may be inferred from negligence, it would be a simple trick to charge willfulness in the complaint, thereby depriving the defendant of the defense of contributory negligence, and then to recover on proof of negligence. We are aware of certain statements in some of the decisions in this jurisdiction which seemingly countenance the view that willfulness may be inferred from negligence; but those statements are vague and general, and are in direct conflict with specific statements to the contrary in the same cases. Those general statements must be regarded— we say it with deference—as instances of careless expression; and they have been discountenanced by the latest decisions. *Fort Wayne, etc., Traction Co.* v. *Justus* (1917), 186 Ind. 464, 115 N. E. 585. It is elementary that one cannot act intentionally unless he acts consciously. Knowledge of the facts involved is essential to intent. *Smith* v. *State* (1879), 2 Lea (Tenn.) 614; *Powe* v. *State* (1886), 48 N. J. Law 34, 2 Atl. 662; *Perugi* v. *State* (1899), 104 Wis. 230, 80 N. W. 593, 76 Am. St. 865; *First Nat. Bank* v. *Swan* (1890), 3 Wyo. 356, 23 Pac. 743; *Georgia, etc., R. Co.* v. *Lee* (1890), 92 Ala. 262, 9 So. 230; *Brim* v. *Alexander* (1915), 185 Mo. App. 599, 172 S. W. 480.

The most striking thing about this evidence is the utter absence of any fact tending to prove willfulness on the part of the men, or any one of them, who were in charge of the troop train. The conductor was in the second coach. He did not see, he could not see, and it was not his duty to see, the block signals. His first intimation of anything unusual was when he felt the application of the air brakes, just as the collision occurred. We know that there were two trains on one track, both

headed in the same direction; that the first one stopped; that there were certain danger signals in the rear of the circus train; that those signals had no effect on the troop train; that the night was dark and cold; and that there was a rear-end collision, resulting in severe injury to the plaintiff. From these facts we must determine by inference why the troop train ran by the signals and into the circus train. That the engineer was negligent is a conclusion which may be legitimately drawn from the evidence. That the engineer and the fireman, or either of them, consciously, knowingly, intentionally, designedly, and willfully disregarded the duty to look for danger signals; or that the engineer, in like manner, ran and propelled his train against the circus train, cannot be legitimately inferred from the evidence. The conclusion that the collision was due to the willfulness of all, or of any, of the men in charge of the troop train, cannot be reached without doing violence to both reason and conscience. If the engineer was conscious of the fact that another train was on the track just ahead of him, then we must presume that he was conscious of his own danger and that the instinct of self-preservation would have deterred him from driving his locomotive at a high rate of speed into such a formidable obstacle. We must also presume that the engineer was a man of normal sensibilities and that, if he had been conscious of any impending danger, either to himself or to anyone, he would not have ruthlessly precipitated that danger. The trial court did not err in directing the verdict.

Our attention has been called to certain federal cases (*New York, etc., R. Co.* v. *Mohney, supra; McCree* v. *Davis* [C. C. A.] 280 Fed. 959) which are not in harmony with the Indiana decisions; and counsel for appellant contend that Dierickx was on an interstate journey at the time of the collision and

that therefore this case is governed by federal law.   We are of the opinion that it is immaterial whether Dierickx was on an interstate or intrastate journey.   We are dealing with a common-law action arising out of tort; no federal statute is involved; the action was instituted in a court of this state; and therefore it is governed by the law of this state.   Furthermore, the ultimate question is one of fact for the court, and must be determined from the evidence in this record, not from the evidence in some other record.

It is to be understood, of course, that the managing officials of the railway company were in fact representatives of the United States Railroad Administration; and the terms "railway company" and "carrier," as used in this opinion are to be taken accordingly.

By virtue of §206, Transportation Act 1920 (41 Stat. at L. 461), James C. Davis, Agent, has been substituted for the original appellee.

The judgment is affirmed.

McMahan, J., not participating.